Leslie Lee LAWSON, Appellant,

v.

COMMONWEALTH of Kentucky,
Appellee.

Harold Sanford Brown, Appellant,

v.

Commonwealth of Kentucky, Appellee.

Nos. 1999–SC–0458–MR,
1999–SC–0491–MR.

Supreme Court of Kentucky.

May 24, 2001.

Rehearing Denied Sept. 27, 2001.

As Amended Oct. 12, 2001.

Richard Hoffman, Assistant Public Advocate, Department of Public Advocacy, Frankfort, Counsel for Appellant, Leslie Lee Lawson.

John Palombi, Assistant Public Advocate, Department of Public Advocacy, Frankfort, Counsel for Appellant, Harold Sanford Brown.

A.B. Chandler, III, Attorney General, Brian T. Judy, Assistant Attorney General,

Criminal Appellate Division, Frankfort, Counsel for Appellee.

KELLER, Justice.

A Laurel County Circuit Court jury convicted Appellants, co-defendants in the trial court below, of second degree arson and second degree burglary and found Lawson to be a first degree persistent felony offender and Brown to be a second degree persistent felony offender. The jury recommended that each Appellant serve consecutive terms of sixty (60) years for the PFO-enhanced second degree arson conviction and twenty (20) years for the PFO-enhanced second degree burglary conviction. The trial court entered judgment in accordance with the jury's recommendation and sentenced each Appellant to serve a total term of eighty (80) years imprisonment. Lawson and Brown appeal to this Court as a matter of right. After a review of the record, we affirm the judgments of the Laurel Circuit Court.

## BACKGROUND

The Laurel County Grand Jury returned an indictment against Appellants charging each with second degree arson and second degree burglary. The indictment alleged each Appellant was subject to penalty enhancement as a first degree persistent felony offender. The charges stemmed from the investigation of a fire started in a home belonging to Robert Jenkins which substantially damaged one room of the home and caused smoke and water damage elsewhere in the residence. In the course of the investigation, Jenkins indicated to the investigating officer, Detective Riley of the Kentucky State Police, that he suspected Lawson and Brown as the culprits, and Detective Riley focused his investigation on Appellants. At trial, the Commonwealth relied upon circumstantial evidence suggesting Appellants unlawfully entered Robert Jenkins's home and started a fire. Appellants defended against the charges at trial by arguing that the Commonwealth failed to satisfy its burden of proof and suggesting that the fire could have started by accident because no witness nor any physical evidence placed them inside the Jenkins home.

Karen Jones and Barbara Flannelly, Appellants' former girlfriends, testified at trial for the Commonwealth that, while returning from a trip the two couples had taken to the lake, Lawson noticed Jenkins's truck and stated "There that SOB is. Let's get him while he ain't home." Other testimony established that Lawson did not like Jenkins and referred to him as a "rat." Jenkins had worked as a police informant, and had provided information in the past which resulted in Lawson's father's arrest. Flannelly, who had driven the couples back from the lake on the date of the fire, testified that Lawson instructed her to drop the men off in Jenkins's neighborhood around the curve from the Jenkins home, drive to the house and verify that Jenkins was not home, and then retrieve Appellants ten (10) to twenty (20) minutes later. The women testified that, just before they dropped off Appellants, Lawson suggested to Brown, "let's hoodoo that punk." According to Flannelly and Jones, the women then proceeded to Jenkins's house, where Jones rang the doorbell and no one answered, and they "revved" the car's engine to signal Appellants that the house was vacant. The women testified that, as they pulled out of Jenkins's driveway, they met up with Flannelly's uncle and decided to travel to a local fast food restaurant. Flannelly and Jones testified that, upon their return from the fast food trip, they heard firecrackers and saw smoke coming from the Jenkins home.

Lois Lyon, Jenkins's neighbor, testified that she saw an older model four-door

grey Oldsmobile sitting in Jenkins's driveway for approximately fifteen minutes with Flannelly behind the wheel and that she saw Flannelly's uncle enter the vehicle. Lyon testified that shortly thereafter she heard firecrackers explode, noticed smoke coming from Jenkins's house, and called 911 to report a fire.

Detective Riley testified that he located the vehicle Lyon described at Appellant Brown's mother's home, and later discovered that car belonged to Barbara Flannelly.

Other witnesses testified that, after the date of the fire at the Jenkins home, Appellants possessed an air rifle and a leather case containing a wrench. Jenkins testified that these items belonged to him and that he had seen them in his home the morning of the fire.

An arson investigator testified to his opinion that the perpetrator intentionally used a lighter or match to ignite what he referred to as combustible material (newspapers, magazines, records, etc.) cluttering the floor of Jenkins's living room.

## TRIAL COURT'S LIMITATION OF LAWSON'S VOIR DIRE

Lawson asserts that the trial court committed reversible error by sustaining three objections during his trial attorney's voir dire and, therefore, limiting the scope of questioning in such a way to prevent him from meaningfully exercising his peremptory strikes.

■ The first such error occurred, according to Lawson, when the trial court prevented him from questioning a member of the jury panel regarding his prior jury service:

Defense: Have any of you served as jurors before today? Start right here, sir. Your number please.

Juror: 23. I, in Ohio, I served as a juror on a case.

Defense: What type of case was that, sir?

Juror: It was arson, actually.

Defense: It was arson. Is there anything about that situation that will affect your judgment here today?

Juror: No, it was a very different type of case.

Defense: What was the result of that case.

Comm: Objection, your honor.

Judge: Sustained as to the result.

Defense: Anything about that case that will affect your decision?

Juror: Absolutely not.

Defense: How long ago was that?

Juror: Probably about six or seven years ago.

Lawson exercised one of his peremptory challenges to remove Juror 23, but argues that the trial court's ruling preventing his counsel from inquiring regarding the verdict in the prior case deprived him of information necessary to make a fully-informed decision regarding whether to excuse the juror.

Lawson's second alleged error concerns the trial court's ruling on the Commonwealth's objection to a question his trial counsel asked the potential jurors about their beliefs regarding leniency within the criminal justice system:

Defense: Anyone feel the courts are too lenient on a defendant when they set a punishment? Anyone feel that sentences should be longer than they are?

Comm.: I'm going to object to this, your Honor.

Judge: Sustained as to that question.

■ RCr 9.38 directs trial courts to afford parties a reasonable opportunity to conduct voir dire examination, and, in

*Thomas v. Commonwealth,*[1] we recognized voir dire's instrumental role in garnering information from jurors to be later used in peremptory challenge decisions.[2] Of course, the ability to "effectively and intelligently" exercise challenges does not justify unlimited voir dire on any topic upon which counsel might wish to probe prospective jurors, and we have granted trial courts discretion to direct the scope of voir dire.[3] We do not believe the trial court abused this discretion.

■ Counsel's questioning revealed that Juror 23 had sat on a jury in a factually distinct arson case a number of years ago in a different jurisdiction which the juror did not believe would have any influence on his decision in this case. Appellant correctly notes that in *McGinnis v. Commonwealth*[4] this Court affirmed the trial court's finding that the Commonwealth had given a racially-neutral explanation for challenging two jurors who "had previously sat on a jury which returned a reckless homicide verdict which [the prosecution] considered pro-defense under the particular circumstances."[5] We cannot agree, however, with Appellant's hasty generalization that a trial court abuses its discretion to control the scope of voir dire whenever it sustains an objection to a question which could potentially provide a racially-neutral explanation for the use of a per-

emptory challenge. Because parties may, essentially, remove jurors by peremptory challenge for any reason other than race or gender, the entitlement which Appellant attempts to "spin" from the *McGinnis* holding would permit unfettered questioning on any topic and strip the trial court of any discretion to control the scope of voir dire. Under the logic of Appellant's argument, every litigant has a *right* to ask prospective jurors to choose a favorite between Elvis Presley and the Beatles because a party could properly exercise peremptory challenges against Elvis-adverse jurors. The fallacy in Lawson's logic is demonstrated by its complete incompatibility with the discretion we have granted trial courts to control the scope of voir dire. We believe that the trial court acted within its discretion in sustaining the Commonwealth's objection to this question and further find that the trial court's ruling did not prevent Lawson from "effectively and intelligently" deciding whether to challenge Juror 23.

■ We likewise find no abuse of discretion in the trial court's ruling preventing Appellant from inquiring of the potential jurors' feelings regarding the leniency of criminal punishments. We recognize that we labeled "proper" a similar question which was posed by the Commonwealth in

---

1. Ky., 864 S.W.2d 252, 259 (1993).

2. *Id.* at 259:
   The principal purpose of voir dire is to probe each prospective juror's state of mind and to ... allow counsel to assess suspected bias or prejudice. Thus, a voir dire examination must be conducted *in a manner that allows the parties to effectively and intelligently exercise their right to peremptory challenges and challenges for cause*
   *Id.* (italicized emphasis in original; underlined emphasis added).

3. *See, e.g., Webb v. Commonwealth,* Ky., 314 S.W.2d 543, 545 (1958) ("A wide latitude is

allowed counsel in examining jurors on their voir dire. The scope of inquiry is best governed by a wise and liberal discretion of the court. The exercise of the discretion does not constitute reversible error unless clearly abused ...." *Id.*); *Tarrence v. Commonwealth,* Ky., 265 S.W.2d 40, 48–49 (1953), cert. denied, 348 U.S. 899, 75 S.Ct. 220, 99 L.Ed. 706 (1954); *McIntosh v. Commonwealth,* Ky.App., 582 S.W.2d 54, 60 (1979).

4. Ky., 875 S.W.2d 518, 523 (1994).

5. *Id.*

*Iles v. Commonwealth.*[6] The fact that a given question might be permissible does not, however, mandate the conclusion that reversible error results whenever a trial court fails to permit it—this is the very nature of discretion. In *Mu'Min v. Virginia,*[7] the United States Supreme Court clarified that the critical inquiry is not whether the question could be helpful, but whether its denial implicated fundamental fairness:

> Questions ... might be helpful in assessing whether a juror is impartial. To be constitutionally compelled, however, it is not enough that such questions might be helpful. Rather, the trial court's failure to ask these questions must render the defendant's trial fundamentally unfair.[8]

We find no such denial of fundamental fairness in the trial court's ruling.

■ We allowed oral argument in this case primarily to address Lawson's argument that the trial court impermissibly limited his voir dire when it sustained the Commonwealth's objection to questioning concerning the members' ability to impose a sentence within a range of penalties:

Defense [9]: The penalty range in this case is—

Comm.: Objection, your honor.

Defense: May we approach?

Judge: Yes.

[Attorneys for the Commonwealth and the defendants then conferred at the bench]

Judge: In bifurcated trials, the first phase is guilt or innocence. The penalty's not a relevant matter.

Defense: Judge, there's a string of cases now about five or six years old that say she's allowed to give the range and to ask if they can consider the full range. If they can't consider the full range, they can't sit as a juror. I don't think that she is allowed to ask anything past that.

Judge: Go ahead. Go ahead. You may ask.

Defense: The penalty range in this case is five years to life. Is there anyone who cannot consider—

Comm.: I'm going to object to that.

Judge: I object. Approach the bench counselors. That is *not* what the range is in this case. The PFO charge is totally separate. The line of cases, I think, talks about only the initial charges.

Defense: I don't, yeah, she cannot mention about PFO, but I mean—

Judge: That was—

Defense: But the entire punishment phase will be considered—

Judge: I don't think that the cases that Mr. Gibbs is talking about says that. I think it talks about only the initial charges. And I think the court should have been advised that that was what you were going to ask.

Defense: Judge, I don't have those cases directly in front of me. It's—I'm trying to remember the exact lan-

---

**6.** Ky., 455 S.W.2d 533, 534 (1970).

**7.** 500 U.S. 415, 111 S.Ct. 1899, 114 L.Ed.2d 493 (1991).

**8.** *Id.* at 500 U.S. 425–26, 111 S.Ct. 1905, 114 L.Ed.2d 506

**9.** At trial, Appellant Lawson was represented by two attorneys. One conducted the voir dire and the other was the primary participant in the bench conferences on this topic. Both of these attorneys are designated as "Defense" in the portion of the trial record set out in this opinion, and the references by "Defense" to "she" refer to the trial counsel who actually questioned the panel during voir dire.

guage—It's—but certainly you can't ask about lessers either, so I don't know where that leaves us.

Judge: Well, let's see, I'm trying to figure out how

Comm.: There's no charge.

Judge: She should move on to the next question. Ladies and gentlemen, if you would disregard the last question by counsel who mentioned that particular range of penalties in this case.

Lawson's trial counsel then addressed a new line of questioning and did not return to the topic of the penalty range. Defense counsel for Brown did not voir dire the panel on this subject. Lawson contends on appeal that the trial court's ruling prevented him from questioning members of the panel to determine if they could consider the full range of possible penalties. We conclude that Lawson's failure to propose a question which properly defined the appropriate penalty range presents no properly preserved error for our review. We nevertheless feel this is an appropriate opportunity to revisit *Shields v. Commonwealth* [10] and its progeny in order to establish parameters for proper penalty-range voir dire in non-capital cases.

In *Shields,* we held that trial courts must allow voir dire questioning of prospective jury members to assess their abilities to consider the range of permissible penalties in the event the trial proceeded to a sentencing phase:

It is true that our current criminal trial procedure generally precludes the jury from hearing purely 'sentencing information' during the guilt or innocence phase of a trial, [but] it does not absolutely preclude their being given some information of that type incidental to a proper voir dire examination. *In order*

*to be qualified to sit as a juror in a criminal case, a member of the venire must be able to consider any permissible punishment.* If he cannot, then he properly may be challenged for cause. *This type of questioning, of course, must come before the guilt or innocence phase since there is no separate voir dire thereafter but before the punishment phase.* [11]

At oral argument, the Commonwealth urged this Court to reconsider *Shields* and hold that penalty-range voir dire is required only in capital cases. We remain convinced that, in all criminal cases, the right to a fair and impartial jury requires the jury to possess the ability to consider the full range of penalties, and we decline the Commonwealth's invitation.

Although we find it easy to resolve the question of *whether* penalty-range voir dire is necessary in non-capital cases, we have struggled for almost a decade with the question of *how* this inquiry should be conducted. In *Shields* itself we recognized that trial courts must be wary of the possibility of prejudice:

Of course, care must be exercised to assure that information unduly prejudicial to either side is not introduced into the voir dire examination unnecessarily or by subterfuge for the real purpose of influencing the jury prematurely. For example, it would be impermissible for the Commonwealth at that stage to attempt to inform the jury of a defendant's prior criminal record or the fact that there would be a persistent felony offender count to be tried if there were a guilty verdict as to the underlying offense. [12]

---

10. Ky., 812 S.W.2d 152 (1991).

11. *Id.* at 153 (emphasis added).

12. *Id.*

The *Shields* majority suggested that penalty-range qualification questions should integrate the possibility of PFO enhancement into the penalty range described to the jury:

> In the case at bar, the record shows that defense counsel was prevented by the *in limine* ruling from telling the jury that the range of punishment would be imprisonment for ten to twenty years. The ruling was correct, since, as indicated by the final sentence, this was not the correct permissible range of punishment; it was twenty years to life, by reason of the PFO count. If the trial court had permitted defense counsel to discuss the range of punishment as requested, then, in fairness, the prosecution should also have been permitted during its questioning to explain that, under certain circumstances in the case, the range of punishment could be from twenty years' to life imprisonment.[13]

In cases decided subsequent to *Shields*, we have attempted to further define the scope of permissible voir dire regarding the penalty range. In *Snodgrass v. Commonwealth*,[14] we held that the trial court properly prevented defense counsel from informing the prospective jury members during voir dire that the Department of Corrections would determine the defendant's parole eligibility under the "violent offender" statute. In *McCarthy v. Commonwealth*,[15] we addressed the appellant's improperly preserved issue concerning whether the trial court erred in allowing voir dire as to the penalty range for the underlying offense without PFO enhancement. The *McCarthy* Court noted that the defendant received the minimum sentence and, therefore, found no error in the trial court's ruling.[16] In *Samples v. Commonwealth*,[17] we found that the trial court properly exercised its discretion when it allowed the Commonwealth to factor the possibility of lesser included misdemeanor offenses into its description of the permissible penalty range:

> During voir dire, the prosecutor told prospective jurors that appellant faced a penalty range of one day to life in prison. Appellant objected because the minimum penalty for the charges in the indictment was one year, not one day. The trial court overruled the objection, concluding that with the potential for instructions on lesser included offenses, the prosecutor's statement was not a misrepresentation of the possible range of punishments.
>
> . . .
>
> *Shields* is distinguishable from the case at bar because it involved an attempt to ask prospective jurors about an impermissible penalty range. Here, the prosecutor told the jurors of a possible minimum penalty, and indeed the jury was ultimately instructed on the misdemeanor offense of second degree unlaw-

---

13.  *Id.*

14.  Ky., 814 S.W.2d 579, 581 (1991) ("The trial court correctly ruled that matters concerning parole eligibility should not be explored until the penalty phase of a bifurcated trial, although he did permit the jury to be informed as to the range of permissible punishment being from twenty (20) years to life imprisonment [on Class A felonies.] This disclosure was sufficient to ensure that qualified jurors were selected to afford both sides a fair and impartial trial." *Id.*).

15.  Ky., 867 S.W.2d 469, 471–472 (1993).

16.  *Id.* at 472 ("In this case a 20 year sentence was imposed. As appellant received the minimum sentence, the trial court's alleged failure to allow voir dire on the penalty range was not error." *Id.*).

17.  Ky., 983 S.W.2d 151, 153–154 (1998).

ful imprisonment. While the voir dire question bordered on exaggeration and tended toward trivialization, there was no direct misrepresentation of the permissible range of punishment. There was no *Shields* violation and the trial court's denial of appellant's motion was proper.[18]

We recognize the difficulty trial courts and attorneys have experienced in defining penalty ranges in such a way as to avoid prejudice to either party and still gather meaningful information about whether jury members can consider the full range of penalties. We observe that the confusion regarding how to pose penalty-range questions during voir dire in non-capital cases remains despite a number of opinions by this Court on the subject, and we suspect the uncertainty stems from the inherent limitations of ad hoc appellate determinations. We have reviewed our previous opinions on this topic and reexamined the value judgments made in those opinions and now hope to finally resolve these questions.

Essentially, the question before the Court is how the possible range of penalties should be described to potential jurors during voir dire examination. Conceptually, we must decide how much information to give jurors before asking if they can consider the full range of penalties.

Initially, we observe that there are significant opportunity costs both to overgeneralizing the inquiry and to overloading the jury with information. We have little confidence that questioning will identify jurors who can actually consider the full range of penalties if we give them no inkling of what those penalties might be and simply inquire whether they will follow the trial court's instructions during the penalty phase.[19] On the other hand, in order to maximize our confidence in the jurors' ability to consider the full range of penalties in the case, we could, in some manner, communicate the possibility of convictions for lesser-included offenses, including misdemeanor offenses, the possibility of PFO-enhancement, and explain the operation of concurrent and consecutive sentencing. The risks associated with such an approach would include: (1) overemphasis of a probabilistic sentencing phase; (2) de-emphasis of jurors' abilities to consider the penalty range by conveying the impression that the jury would enjoy largely unfettered sentencing discretion;[20] (3) implicit disclosure of the defendant's prior criminal record in any attempt to address the topic of PFO enhancement; and (4) a substantial risk of misinformation inherent in any attempt to define penalty ranges for lesser included offenses before the presentation of evidence.

18. *Id.*

19. *See Morgan v. Illinois,* 504 U.S. 719, 735–36, 112 S.Ct. 2222, 119 L.Ed.2d 492, 506–07 (1992) ("As to general questions of fairness and impartiality, such jurors could in all truth and candor respond affirmatively, personally confident that such dogmatic views are fair and impartial, while leaving the specific concern unprobed." *Id.*); *Wainwright v. Witt,* 469 U.S. 412, 424–25, 105 S.Ct. 844, 83 L.Ed.2d 841, 852 (1985) ("[M]any venire[persons] ... may not know how they will react ... or may be unable to articulate ... their true feelings." *Id.*).

20. *See Snodgrass v. Commonwealth, supra* note 14 at 584 (Combs, J. dissenting) ("Surely one year-to-life is *not* the penalty for *each* offense, or for *any* of them. This misinformation misleads the jury into believing that its sentencing discretion will be virtually unlimited, no matter the conviction. It further deprives counsel of optimal use of peremptory strikes after identification of jurors uncomfortable with the *true* penalty range for a particular offense. Once more, this defendant was disadvantaged." *Id.* (emphasis in original)).

█ There is no perfect way to define the penalty range. Any attempt to maximize the ability to identify those jurors capable of considering the full range of penalties by exposing them to additional sentencing information linearly increases the risk of prejudice. Accordingly, we must strike a balance which maximizes the fundamental fairness of the proceeding by weighing the importance of selecting a fair and impartial jury against the fairness concerns implicated by the "information overload" approach. We feel that interests of fairness, uniformity, and certainty require that this balance be struck by this Court. After much reflection, we believe voir dire should examine jurors' ability to consider only the penalty ranges for the individual indicted offenses without PFO enhancement. Affirmative answers to such questions allow substantial confidence in jurors' abilities to consider the full range of penalties without potentially misleading them or otherwise prejudicing the defendant.

█ Accordingly, we hold that in all non-capital criminal cases where a party or the trial court wishes to voir dire the jury panel regarding its ability to consider the full range of penalties for each indicted offense, the questioner should define the penalty range in terms of the possible minimum and maximum sentences for each class of offense—i.e., a fine of not more than $250.00 for a violation, a term of imprisonment of not more than ninety (90) days and/or a fine of not more than $250.00 for a Class B misdemeanor and not more than twelve (12) months and/or a fine of not more than $500.00 for a Class A misdemeanor, or a term of imprisonment of one (1) to five (5) years for a Class D felony, five (5) to ten (10) years for a Class C felony, ten (10) to twenty (20) years for a Class B felony, and twenty (20) years to life imprisonment for a Class A felony or a capital offense for which the death penalty is not authorized. We overrule *Shields*, *McCarthy*, and *Samples* to the extent they hold otherwise.

█ In the case now before the Court, we find no reversible error in the trial court's ruling. By conglomerating the charges, Lawson's trial counsel misstated the possible range of penalties even under *Shields*. Lawson's trial counsel defined the possible penalties in this case as ranging from "five years to life." Although this definition properly characterizes the maximum possible penalty either for the indicted offense of second degree arson, if enhanced by PFO, or the maximum penalty to which convictions on both offenses, if enhanced by PFO, could aggregate, it misled the jury with respect to the minimum sentence. The jury could only sentence Lawson to five years if it found him guilty of the second degree burglary charge (a Class C felony with a penalty range of between five (5) and ten (10) years), but not guilty as to both the second degree arson charge (a Class B felony with a penalty range of between (10) and twenty (20) years) and the PFO indictment. Lawson's trial counsel's definition did not properly state either the appropriate penalty range for any individual offense or the possible "functional penalty range" to which convictions on the two indicted offenses could aggregate.

We also believe Lawson mischaracterizes the trial court's ruling with regard to the permissible scope of voir dire on the panel's ability to consider the full range of penalties. The trial court, rather than prohibiting Lawson's trial counsel from any further questioning on this subject, merely limited the voir dire to whether the jury could consider the full range of penalties for the indicted offenses without enhancement by PFO. Prior to counsel's definition of the penalty range, the trial court

appears to have overruled the Commonwealth's objection to voir dire regarding the penalty range. After counsel misdefined the possible penalty range, the trial court instructed counsel to move on to the next question, and admonished the jury to disregard the "last question by counsel who mentioned *that particular range of penalties* in this case." We find that the trial court's ruling correctly prevented Lawson's trial counsel from misinforming the jury regarding the available penalty range, but did not prohibit her from questioning the panel regarding its ability to impose a penalty within the range available for the indicted offenses. As Lawson made no further effort in the trial court to voir dire the panel on the correct penalty range, his argument hinges on speculation that the trial court would not have permitted him to ask questions he wished to ask, and he has not preserved this error for our review.[21]

### PEREMPTORY CHALLENGES

■ Both Appellants argue, on the basis of RCr 9.40 and *Springer v. Commonwealth*,[22] that the trial court erred in assigning an insufficient number of peremptory challenges for Appellants to exercise independently. Although neither Appellant made any reference before the trial court to the number of peremptory challenges authorized by RCr 9.40, both Brown and Lawson allege preservation through Brown's trial counsel's request that the trial court grant his client "extra strikes."

■ We find that neither Appellant properly preserved this issue for our review. Neither Brown nor Lawson objected to the trial court's determination of the number of challenges authorized by RCr 9.40. We held in *Kentucky Farm Bureau Mut. Ins. Co. v. Cook*[23] that a trial court's improper allocation of peremptory strikes "requires reversal as a matter of law *if the issue is properly preserved by the adversely affected litigant.*"[24] Only a contemporaneous objection to the trial court's improper allocation of peremptory challenges will preserve such an error for our review, and Brown's counsel's request for "bonus" challenges does not meet this standard. Although Brown contends that his counsel's vague request for additional peremptory challenges *could* have been a claim to entitlement under RCr 9.40, we find no difficulty distinguishing between properly preserved RCr 9.40 objections and requests for additional challenges as a matter of grace.[25] Brown's trial counsel did

---

**21.** *See McCarthy v. Commonwealth, supra* note 15 at 471 ("Appellant contends that he wanted to tell the jury that the correct permissible range was 20 years to life as this appellant would be subject to the PFO statute. The appellant's argument ... was not preserved for appellate review. He did move for voir dire on the penalty range of burglary in the first degree and assault in the second degree, but no further." *Id.*).

**22.** Ky., 998 S.W.2d 439 (1999).

**23.** Ky., 590 S.W.2d 875, 877 (1979).

**24.** *Id.* (emphasis added). *See also Gabow v. Commonwealth*, Ky., 34 S.W.3d 63, 75 (2000).

**25.** The distinction is as clear as the one between a demand for one's "fair share" and a request for "some more." *See* CHARLES DICKENS, OLIVER TWIST, 55–58 (Peter Faircloth ed., Penguin Classics 1985) (1837–9):

> The room in which the boys were fed was a large stone hall, with a copper at one end, out of which the master, dressed in an apron for the purpose, and assisted by one or two women, ladled the gruel at mealtimes; of which composition each boy had one porringer, and no more—except on festive occasions, and then he had two ounces and a quarter of bread besides.... A council was held; lots were cast who should walk up to the master after supper that

not claim that the trial court denied Brown his "fair share," but rather requested an additional portion. Accordingly, we decline to review Appellants' allegation of error with respect to the allocation of peremptory challenges.

## DIRECTED VERDICT MOTIONS

Both Appellants argue that the trial court erred in denying their motions for directed verdict at the close of the Commonwealth's case-in-chief because: (1) the Commonwealth failed to prove an essential element of the crime of second degree arson when the prosecution failed to introduce evidence on the "issue" of whether Robert Jenkins consented to the damage to his home; and (2) because the Commonwealth introduced no direct physical evidence showing that they entered the Jenkins home and started a fire, the prosecution failed to sufficiently prove the elements of second degree arson and second degree burglary. After a review of the record, we find no merit to Appellants' arguments.

▮▮▮▮ KRS 513.030 defines the crime of arson in the second degree:

(1) A person is guilty of arson in the second degree when he starts a fire or causes an explosion with intent to destroy or damage a building:

　(a) Of another; or

　(b) Of his own or of another, to collect or facilitate the collection of insurance proceeds for such loss.

(2) In any prosecution under this section, it is a defense that:

　(a) No person other than the defendant had a possessory or proprietary interest in the building, or, if other persons had such an interest, all of them consented to the defendant's conduct; and

　(b) The defendant's sole intent was to destroy or damage the building for a lawful purpose.[26]

The Commentary to this statute clarifies that KRS 513.030(2) outlines a defense to the crime of second degree arson:

In this section, a defense unavailable for first degree arson is provided for arson in the second degree when the following elements coincide: the defendant was the sole owner of the damaged building or was acting with consent of the owners; and the defendant's sole intent was to destroy or damage the building for a lawful purpose. Labeling the principle as a "defense" means that a defendant need only raise the issue.[27]

KRS 500.050(1) explains the Commonwealth's burden of proof with respect to provisions designated as a "defense":

(1) The Commonwealth has the burden of proving every element of the case beyond a reasonable doubt, except as provided in subsection (3). This provi-

---

evening, and ask for more; and it fell to Oliver Twist.

　The evening arrived; the boys took their places. The master, in his cook's uniform, stationed himself at the cooper; his pauper assistants ranged themselves behind him; the gruel was served out; and a long grace was said over the short commons. The gruel disappeared; the boys whispered each other, and winked at Oliver, while his next neighbors nudged him. Child as he was, he was desperate with hunger, and

reckless with misery. He rose from the table, and advancing to the master, basin and spoon in hand, said; somewhat alarmed at his own temerity:

　'Please, sir, I want some more.'

*Id.*

**26.** KRS 513.030.

**27.** KRS 513.020, Official Commentary (Banks/Baldwin 1974).

sion, however, does not require disproof of any element that is entitled a "defense," as that term is used in this code, unless the evidence tending to support the defense is of such probative force that in the absence of countervailing evidence the defendant would be entitled to a directed verdict of acquittal.[28]

In a second degree arson case, therefore, the trial court need not instruct the jury regarding owner consent unless the evidence presented raises an issue relating to the defense. Appellants did not testify at trial, and trial counsel's cross examination strategy and closing argument exclusively presented a "didn't do it" defense. Our review of the record convinces us that no witness testified regarding either element of the defense. Notwithstanding this, elements (D) and (E) of the trial court's second degree arson instruction contained the KRS 513.030(2) defense:

> You will find the Defendant guilty of Second–Degree Arson under this Instruction if, and only if, you believe from the evidence beyond a reasonable doubt all of the following:
>
> A. That in this county on or about the 15th day of June, 1998, and before the finding of the Indictment herein, he, acting alone or in concert with others, damaged or destroyed a dwelling by setting fire to an unoccupied dwelling house owned by Robert L. Jenkins;
>
> B. That he started the fire intentionally;
>
> C. That in so doing, it was his intention to damage or destroy the occupied dwelling house;
>
> AND
>
> D. Robert L. Jenkins did not consent to the damage or destruction of the unoccupied dwelling house;
>
> AND
>
> E. That in so doing, it was not the Defendant's sole intent to damage or destroy the dwelling for a lawful purpose.

▮ Although we find that the trial court erroneously incorporated the defense into the jury instructions, we see no reversible error with respect to Appellants. The additional elements could in no way prejudice Brown and Lawson, as the instructions required the jury to find that the Commonwealth proved each element of the offense beyond a reasonable doubt. We believe the victim's outrage over Appellants' actions allowed the jury to reasonably infer that Jenkins had not given Brown and Lawson permission to damage his home.

▮ Additionally, we hold that the trial court properly denied Appellants' motions for directed verdicts which alleged insufficiency of the evidence because "[o]n appellate review, the test of a directed verdict is, if under the evidence as a whole, it would be *clearly unreasonable* for a jury to find guilt, only then is the defendant entitled to a directed verdict of acquittal."[29] The Commonwealth built a substantial, if circumstantial, case against

---

**28.** KRS 500.070(1). *See also* KRS 500.070, Official Commentary (Banks/Baldwin 1974): This provision is a special definition section to apply generally throughout the Code. It assumes that in defining the specific offenses, and some of the general provisions, there will be a need for two different types of "defenses." The first, which will be designated simply as "defense," will serve to impose upon a defendant only the responsibility of raising a certain issue. Once such an issue is raised the state must establish its negative beyond a reasonable doubt. This concept is used to eliminate the necessity of the state disproving elements that are not really involved in the case.

**29.** *Commonwealth v. Benham*, Ky., 816 S.W.2d 186, 187 (1991) (emphasis added).

Brown and Lawson on the basis of their incriminating statements, motives, presence in the area of the home at the time the fire began, and subsequent possession of items taken from inside the home. We have held that trial courts, in ruling upon a motion for a directed verdict, consider not only the actual evidence, but also "must draw all *fair and reasonable inferences* from the evidence in favor of the Commonwealth." [30] Although Appellants bemoan the circumstantial nature of the evidence against them, "circumstantial evidence is sufficient to support a criminal conviction as long as the evidence taken as a whole shows that it was not clearly unreasonable for the jury to find guilt." [31] In *Hendley v. Commonwealth,* [32] we found similar evidence sufficient to support an arson conviction:

> In the case at bar there is the testimony of two witnesses who place the appellant at or in very close proximity to the apartment shortly prior to the fire.... Counsel for appellant vigorously argues that the only evidence connecting the appellant with the commission of the crimes ... is circumstantial. It can hardly be contended by the appellant that he can be found to be the guilty culprit only if he is actually seen igniting the fire. Arsonists don't work that way. [ ] Circumstantial evidence may be considered by the court when weighing the quality of evidence to establish the body of the crime.
>
> ... We are of the opinion, even excluding the appellant's testimony and his confession, that from the remaining evi-

dence as a whole it would not be clearly unreasonable for a jury to find the appellant guilty. [33]

We believe the jury could reasonably infer Appellants' guilt on the basis of the evidence presented by the Commonwealth, and we find that the trial court properly denied Appellants' motions for directed verdict.

## ARSON THIRD DEGREE AS A LESSER INCLUDED OFFENSE

Both Appellants argue the trial court committed palpable error when it failed to incorporate, sua sponte, an instruction on the lesser included offense of third degree arson within the jury instructions. Appellants concede they made no request for such an instruction to the trial court below, but assert that "manifest injustice" resulted from its omission because the evidence presented would have allowed the jury to conclude that they intentionally started a fire inside the Jenkins home, but that they did not intend to damage or destroy the building. [34]

We find that the trial court properly decided not to instruct the jury regarding the lesser included offense of third degree arson. When a defendant denies any involvement in the crime alleged, and the evidence presented does not otherwise suggest reasonable doubt regarding the degree of an offense, trial courts need not instruct regarding lesser included offenses. [35] Although Appellants

---

**30.** *Id.* (emphasis added).

**31.** *Bussell v. Commonwealth,* Ky., 882 S.W.2d 111, 114 (1994).

**32.** Ky., 573 S.W.2d 662 (1978).

**33.** *Id.* at 665.

**34.** *See* KRS 513.040 ("A person is guilty of arson in the third degree if he wantonly causes destruction or damage to a building of his own or of another by intentionally starting a fire or causing an explosion." *Id.*).

**35.** *See Parker v. Commonwealth,* Ky., 952 S.W.2d 209, 211–212 (1997).

suggest a jury could have believed they intentionally started a fire inside Jenkins's home in an attempt to destroy some of the victim's personal possessions, but speculate that they started the fire without an intent to damage the house itself, we do not find evidentiary support in the record for such conjecture. This Court has recognized that "[i]ntent may be inferred from actions because a person is presumed to intend the logical and probable consequences of his conduct and a person's state of mind may be inferred from actions preceding and following the charged offense."[36] The evidence in this case supports only the inference that the appellants intended to carry out Lawson's invitation to "hoodoo that punk" and "get him while he ain't home" by damaging or destroying his house. Accordingly, we hold that the trial court properly instructed the jury regarding only the indicted offense of second degree arson.

### PRIOR BAD ACTS EVIDENCE

Both Appellants argue they suffered prejudice as a result of trial testimony ranging from Brown's former girlfriend's testimony that Brown was "crazy" and "insane" and abused both cocaine and prescription pills to a juror's statement during voir dire that he knew Lawson because of the juror's employment at the detention center. Appellants concede that they made no objections in the trial court to any of the testimony they identify as prejudicial on appeal, and, after a thorough review of the claims, we do not find a substantial possibility that the exclusion of this testimony would have resulted in a different verdict.[37]

### STATUTORY MODIFICATIONS TO MAXIMUM SENTENCE

■ The crimes with which the jury convicted Appellants occurred on June 15, 1998. On July 15, 1998, a number of changes to the Kentucky Penal Code became effective, including changes to the sentencing ranges in felony cases. Lawson asserts that two of these changes are relevant to the judgment imposed by the Laurel Circuit Court: (1) although life imprisonment remains a possible sentence for any Class A felony or a Class B felony enhanced by first degree PFO status, the maximum indeterminate term of imprisonment to which a trial court may sentence a defendant for such an offense is fifty years;[38] and (2) trial courts may not aggregate multiple sentences of imprisonment for indeterminate terms for longer than a total of seventy (70) years.[39] The trial court instructed the jury and entered final judgment under the old statutory provisions which provided no limit on the

---

**36.** *Id.* at 212 (citing *Davidson v. Commonwealth*, Ky., 340 S.W.2d 243 (1960); *Wilson v. Commonwealth*, Ky., 601 S.W.2d 280 (1980); *Claypoole v. Commonwealth*, Ky., 337 S.W.2d 30 (1960)).

**37.** *See Partin v. Commonwealth*, Ky., 918 S.W.2d 219, 224 (1996); *Byrd v. Commonwealth*, Ky., 825 S.W.2d 272, 276 (1992); *Jackson v. Commonwealth*, Ky.App., 717 S.W.2d 511 (1986).

**38.** *See* KRS 532.060(2) ("The authorized maximum terms of imprisonment for felonies are: (a) For a Class A felony, not less than twenty (20) years nor more than fifty (50) years, or

life imprisonment." *Id.*); KRS 532.080(6) ("A person who is found to be a persistent felony offender in the first degree shall be sentenced to imprisonment as follows: (a) If the offense for which he presently stands convicted is a Class A or Class B felony, a persistent felony offender in the first degree shall be sentenced to an indeterminate term of imprisonment, the maximum of which shall not be less than twenty (20) years nor more than fifty (50) years, or life imprisonment." *Id.*).

**39.** *See* KRS 532.110(1)(a) ("In no event shall the aggregate of consecutive indeterminate terms exceed seventy years." *Id.*).

term of years a defendant might receive in connection with a Class B felony enhanced by first degree PFO and made life imprisonment the only limit to which trial courts could aggregate multiple indeterminate prison sentences for offenses of this degree. Lawson received a term of sixty (60) years for his PFO-enhanced second degree arson conviction and a total sentence of eighty (80) years. Lawson alleges that the trial court lacked the jurisdiction to enter judgment sentencing him outside the statutory limits in place at the time of trial.

We recently addressed a similar issue in *Commonwealth v. Phon*,[40] and held that KRS 446.110 governs the retrospective application of legislative amendments to punishment provisions of the Kentucky Penal Code.[41] KRS 446.110 reads:

> No new law shall be construed to repeal a former law as to any offense committed against a former law, nor as to any act done, or penalty, forfeiture or punishment incurred, or any right accrued or claim arising under the former law, or in any way whatever to affect such offense or act so committed or done, or any penalty, forfeiture or punishment so incurred, or any right accrued or claim arising before the new law takes effect, except that the pro-

ceedings thereafter shall conform, so far as practicable, to the laws in force at the time of such proceedings. *If any penalty, forfeiture or punishment is mitigated by any provision of the new law, such provision may, by the consent of the party affected, be applied to any judgment pronounced after the new law takes effect.*[42]

At common law, when the legislature modified or repealed a statute, the courts no longer had the authority to enter any judgment relying upon the prior law.[43] KRS 446.110 modifies this common law rule so that, unless the General Assembly specifically designates otherwise, "offenses committed against the statute before its repeal, may thereafter be prosecuted, *and the penalties incurred may be enforced.*"[44] Unquestionably, therefore, the trial court had jurisdiction to sentence Lawson under the pre-amendment provisions of KRS Chapter 532.

This Court and its predecessor have consistently interpreted KRS 446.110 to require courts to sentence a defendant in accordance with the law which existed at the time of the commission of the offense unless the defendant specifically consents to the application of a new law which is "certainly" or "definitely" mitigating.[45] As Lawson did not raise any issue in the trial

---

40. Ky., 17 S.W.3d 106 (2000).

41. *Id.* at 108 ("KRS 446.110 deals specifically with the procedure to be followed when a law is amended.... This interpretation ... prevents KRS 446.110 from being meaningless where there is no express declaration of retroactivity in a new statute containing mitigating penalties." *Id.*).

42. KRS 446.110 (emphasis added).

43. *See, e.g., Commonwealth v. Louisville & N.R. Co.*, 186 Ky. 1, 215 S.W. 938, 939 (1919).

44. *Id.* at 940. *See also Dial v. Commonwealth*, 142 Ky. 32, 133 S.W. 976, 977 (1911)

("But it is insisted by appellant that, as the statute which allowed the jury to fix the penalty is now repealed, therefore there is not any tribunal to apply it, and he must go free. Not so. [KRS 446.110] expressly saves the case and preserves the old statute as to its penalty for offenses committed under it." *Id.*).

45. *See, e.g., Commonwealth v. Phon, supra* note 40 at 108 ("[U]pon the unqualified consent of the defendant, a sentence of life without parole may be lawfully imposed for capital crimes committed before July 15, 1998." *Id.*); *Kinser v. Commonwealth*, 181 Ky. 727, 205 S.W. 951 (1918) ("[T]he present law could not be applied without the consent of

court concerning the new provisions of KRS Chapter 532, he certainly did not consent to the application of the modified provisions. Without reaching the issue of whether those statutory modifications definitely mitigate the existing penalty ranges, we hold that, under the law at the time of the commission of these offenses, the trial court did not err either in the manner in which it instructed the jury regarding the penalty range or in its final judgment imposing sentence.

For the above reasons, we affirm the judgment of the Laurel Circuit Court in each of these cases.

All concur.

appellant." *Id.*); *Coleman v. Commonwealth*, 160 Ky. 87, 169 S.W. 595, 597 (1914) ("Confusion and uncertainty will be avoided when the punishment in force when the offense is committed is followed, as it should be, unless the punishment is definitely mitigated by the new law and the accused consents, as provided in [KRS 446.110], that judgment may be pronounced under the new law." *Id.*); *Col-*lier *v. Commonwealth*, 160 Ky. 338, 169 S.W. 740, 741–742 (1914) ("Where an act mitigating an offense goes into effect after the offense is committed, and before the trial, if the parties consent the trial court may give the defendant the benefit of the new act[.]" *Id.*); *Stewart v. Commonwealth*, 141 Ky. 522, 133 S.W. 202, 203 (1911); *Cockerell v. Commonwealth*, 115 Ky. 296, 73 S.W. 760, 762 (1903).