# IMPORTANT NOTICE
## NOT TO BE PUBLISHED OPINION

THIS OPINION IS DESIGNATED "NOT TO BE PUBLISHED." PURSUANT TO THE RULES OF CIVIL PROCEDURE PROMULGATED BY THE SUPREME COURT, CR 76.28(4)(C), THIS OPINION IS NOT TO BE PUBLISHED AND SHALL NOT BE CITED OR USED AS BINDING PRECEDENT IN ANY OTHER CASE IN ANY COURT OF THIS STATE; HOWEVER, UNPUBLISHED KENTUCKY APPELLATE DECISIONS, RENDERED AFTER JANUARY 1, 2003, MAY BE CITED FOR CONSIDERATION BY THE COURT IF THERE IS NO PUBLISHED OPINION THAT WOULD ADEQUATELY ADDRESS THE ISSUE BEFORE THE COURT. OPINIONS CITED FOR CONSIDERATION BY THE COURT SHALL BE SET OUT AS AN UNPUBLISHED DECISION IN THE FILED DOCUMENT AND A COPY OF THE ENTIRE DECISION SHALL BE TENDERED ALONG WITH THE DOCUMENT TO THE COURT AND ALL PARTIES TO THE ACTION.

RENDERED: OCTOBER 28, 2021
NOT TO BE PUBLISHED

# Supreme Court of Kentucky

2019-SC-0623-MR

SHILO THOMAS JOSEPH                                      APPELLANT

V.
             ON APPEAL FROM JEFFERSON CIRCUIT COURT
             HONORABLE A. C. MCKAY CHAUVIN, JUDGE
             NOS. 18-CR-003099 & 19-CR-002096

COMMONWEALTH OF KENTUCKY                          APPELLEE

**MEMORANDUM OPINION OF THE COURT**

**<u>AFFIRMING</u>**

Shilo Joseph (Joseph) was found guilty of second-degree manslaughter, first-degree burglary, and being a second-degree persistent felony offender (PFO). He now appeals his convictions and resulting twenty-year sentence as a matter of right.[1] After review, we affirm.

## I. FACTUAL AND PROCEDURAL BACKGROUND

Joseph was indicted in relation to the stabbing death of Antonio Starks (Antonio). Joseph was accused of stabbing Antonio after burglarizing the apartment Antonio shared with Jerrica Goodlowe (Jerrica). Apart from Joseph and Antonio, there was one person present during the stabbing: Dennis Madorskiy (Dennis). At trial, Joseph argued that he stabbed Antonio in self-defense. He further asserted that he sought to retrieve only his personal

---

[1] Ky. Const. § 110(2)(b).

belongings from Jerrica and Antonio's apartment and therefore could be guilty of, at most, criminal trespass.[2]

Joseph, Antonio, and Dennis were all connected via their relationships, current and former, with Jerrica. Jerrica and Dennis dated first. They met in high school, were together for about six years, and have one child in common, Anna.[3] Jerrica and Dennis eventually stopped seeing each other romantically, but continued to have a cordial, co-parenting relationship for Anna's sake. Around 2008, Jerrica began seeing Joseph. They dated on and off until July 2018, when they ended their relationship for good. Jerrica and Joseph had two children together: Betty and Caroline. In June 2018, during a period when Jerrica and Joseph were separated but still trying to work on their relationship, Jerrica began dating Antonio. Later, in early August 2018, Antonio moved into Jerrica's apartment where she and her three daughters were already living. As Antonio had three daughters of his own, this meant that the eight of them were living in Jerrica's small, third floor apartment together.

On October 13, 2018, about two months after Antonio moved in with Jerrica, Jerrica threw a birthday party for her middle child, Betty. The party was at Jerrica's mother's house, which is a couple minutes' drive from Jerrica's apartment. Jerrica invited both Dennis and Joseph because their daughters were going to be there, and Joseph also brought his infant child from a different relationship with him. Antonio was also there, primarily cooking

---

[2] *See* Kentucky Revised Statute (KRS) 511.060.

[3] We refer to all of the children by pseudonym to protect their privacy.

outside on the grill.  It was undisputed that shortly after Joseph arrived, he and Jerrica went off to the side of the house to have a private conversation. However, the Commonwealth and Joseph presented differing accounts as to the content of that conversation.

Jerrica testified that during their conversation Joseph was upset and angry, but not irate or unhinged.  His primary complaint was about Antonio's presence at the party.  Joseph told her that Betty was his daughter, and that Antonio did not need to be there.  Joseph also mentioned to Jerrica that he was upset that their daughters were having a difficult time adjusting to living in her apartment with Antonio and his children.  Jerrica explained to Joseph that the girls were not upset about Antonio.  Rather, there was tension among the six children because they were having trouble learning to live together.  Jerrica denied that Joseph said anything about her still having any of his personal belongings, though she did acknowledge during cross-examination that she still had some of his shirts.  She stated that Joseph had previously told her she still had some of his things at her apartment that he wanted to get, but she was adamant that it was not discussed during their conversation at the party.

Joseph similarly testified that his conversation with Jerrica at the party was tense, but insisted that they discussed him getting the rest of his belongings back from her.  He claimed that she still had a trunk that belonged to his father with several of his father's belongings in it, as well as some of Joseph's clothing, his cologne, and a laptop.  He testified that when he told her he wanted his stuff back, "she said she didn't care, whatever."  Though during

cross-examination, he acknowledged that he did not specifically tell her that he intended to go to her apartment as soon as he left the party to retrieve his things. And, Jerrica testified that Joseph did not give her any indication that he was going to her apartment when he left the party. However, Dennis testified that he saw Jerrica and Joseph talking and remembered Joseph saying something like "I've got some stuff in there," but he could not remember exactly what Joseph said. It should also be noted that Joseph never lived in that apartment with Jerrica, nor did he have a key or permission to be in the apartment when Jerrica was not there.

Joseph left the party shortly after his conversation with Jerrica. Both Jerrica and Joseph testified that Joseph intended to come back when the party was over to get Anna, Betty, Caroline, and the baby so he could throw another party for Betty at his house. Jerrica testified that after Joseph left, Antonio inquired about the conversation they had. Jerrica could tell Antonio was very angry, but told him not to worry about it. Jerrica fixed herself and Antonio a plate of food and they sat down to eat. She said that about the time they sat down to eat, Dennis told them he was leaving. Dennis did not say where he was going, but Jerrica assumed he was going home. Then, Jerrica suddenly realized that Antonio was gone, but he had not told her where he was going.

Dennis testified that as he was leaving, he noticed Antonio in a car in the driveway and stopped to talk to him. Antonio told Dennis that he was going to Jerrica's apartment because he had a feeling that Joseph went over there after he left. Dennis told Antonio that he would follow him over there just to make

4

sure everything was okay, though he thought Antonio was being paranoid.

The Commonwealth and Joseph presented opposing versions of what occurred after Joseph, Antonio, and Dennis arrived at the apartment complex. Security cameras from the exterior of the apartment building showed that Joseph arrived at the apartment complex approximately fifteen minutes before Antonio and Dennis. The same cameras also showed that Antonio entered the apartment building before Dennis, but Dennis was very close behind him. The Commonwealth posited that Joseph kicked the apartment door in, and was presumably already in the apartment when Antonio and Dennis arrived.

Dennis testified for the Commonwealth that he could hear Antonio's footsteps above him on the stairs when he entered the apartment building. He said he never heard anything that sounded like two people crashing through a door when he was coming up the stairs. When Dennis got to Jerrica's and Antonio's apartment on the third floor, both Antonio and Joseph were in the apartment. Dennis noticed that the wood around the apartment door was broken as he was walking towards the door. As soon as Dennis reached the threshold of the apartment, Joseph came running out and bumped into him. Dennis said that Joseph immediately became defensive as though he thought Dennis and Antonio were going to jump him. Dennis asked Joseph what he was doing there, and Antonio exited the apartment simultaneously with him asking the question. At this point, the three men stood in a triangle outside the apartment; Joseph was the closest to the top of the stairs with his back to the stairs. Dennis said that Joseph had a pocketknife in his hand with the

5

blade out, but neither Dennis nor Antonio had a weapon. Antonio then said to Joseph, "I already knew you were gonna be on some bullshit that's why I called the police. They're already out there waiting on you." Joseph, still with a pocketknife in one hand, offered Antonio a fist bump with his other hand as a kind of peace offering. He said to Antonio, "this ain't even about you, this is between me and my baby momma." Antonio rejected Joseph's fist bump, and Joseph turned towards the stairs.

According to Dennis, when Joseph turned towards the stairs, Antonio "rushed at him" and pushed Joseph down the stairs with both hands onto the landing below. On that landing, there was a railing connected to the walls on either side of it at the railing's left top and bottom corners and right top and bottom corners. The other side of the railing was open to the rest of the stairwell, meaning that if one were to look over the railing, they would see all the way down the stairwell to the first floor. Dennis said that after Antonio pushed him, Joseph lost his balance and caught himself on the railing, causing it to break. Joseph then fell down towards the bottom corner of the railing, and was sitting there when Antonio came down the stairs at him. Antonio had his fist raised at Joseph like he was going to hit him, and Joseph stabbed Antonio once toward the top of his chest. Dennis said that Joseph looked "pale white and scared" and ran out of the building. Antonio died from the stab wound very shortly thereafter.

In contrast, Joseph agreed that he arrived at the building about fifteen minutes before, but asserted that he was stopped by a man that he did not

6

know for several minutes. Joseph said the man kept talking to him and Joseph "could not get him to shut up". Eventually, Joseph cut him off and got the man to leave him alone. At that point, he went up to Jerrica's apartment and started to try to card the lock. As he was messing with the lock, he heard someone running up the stairs. Joseph turned and saw that it was Antonio, who angrily asked him what he was doing there. Antonio then tackled Joseph through the door, breaking it. They fell into the apartment, and Antonio ran towards the back of the apartment. Fearing that Antonio was going to get a weapon, Joseph ran out of the apartment and into Dennis who was standing near the threshold. Antonio then came running out of the apartment, and Joseph got his pocketknife out because he feared the pair were going to jump him. He claimed he did not open the knife to expose the blade at that time, but he agreed that neither Antonio nor Dennis had a weapon. Joseph also recounted that Antonio told him the police were there, and that he offered Antonio a fist bump, which he rejected. However, Joseph claimed that his knife was in his pocket and not his other hand when he made the peace offering.

Joseph said he then turned to go down the stairs because he feared for his safety and believed the police were outside. He turned and took a couple of steps toward the stairs, and thought that both Antonio and Dennis pushed him down the stairs. When the three of them got to the landing below, Antonio and Dennis began pushing him against the railing. Joseph's upper torso was over the railing as it started to break. He was scared that the railing was going to

7

fully give way and that he would fall three stories. Therefore, he got his pocketknife out of his pocket, pushed Antonio back with his elbow, opened the knife, and made a stabbing motion at Antonio. He claimed that he did not intend to kill or hurt Antonio or Dennis, he just wanted to get them off of him. After that he ran down the stairs and left the scene. He did not know that Antonio died until either that night or the next morning. He turned himself in several days later on October 18. It was undisputed that the inside of the apartment was not disturbed, and nothing was taken from it.

In relation to the stabbing, the jury was instructed on murder, first-degree manslaughter, three different theories of second-degree manslaughter, and three different theories of reckless homicide. Ultimately, the jury convicted Joseph under a theory of second-degree manslaughter that required that he either intentionally or wantonly caused Antonio's death, but that he acted in imperfect self-defense. Regarding Joseph's entry into the apartment, the jury was instructed on both first-degree burglary and first-degree criminal trespass. He was found guilty of first-degree burglary.

Additional facts are discussed below as necessary.

## II. ANALYSIS

Joseph presents a litany of alleged reversible errors to this Court, and we will address each argument in turn.

8

**A. The Commonwealth did not make impermissible comments on Joseph's post-*Miranda*[4] silence. No reversal is required.**

Joseph first asserts that the Commonwealth made two impermissible comments on his Fifth Amendment[5] right to remain silent. The first occurred during the Commonwealth's cross-examination of him. The complained-of exchange was as follows:

> **Q:** So, we've talked about the time frame between October 13, 2018, and when you turned yourself in on October 18, 2018. You never called the police, correct?
>
> **A:** That is correct.
>
> **Q:** You never called 911, correct?
>
> **A:** Correct.
>
> **Q:** Okay, you never reported being assaulted, correct?
>
> **A:** That is correct.
>
> **Q:** In fact, this is the first time you're ever giving this version of events, correct?

Defense counsel objected to the last question and contended that the jury could draw an inference from the question that Joseph had never told *the police* his version of events, thereby constituting a violation of his Fifth Amendment right to remain silent.[6] The trial court disagreed and reasoned that the question did not concern a refusal to speak to or give a recorded statement to police. Instead, the question was meant to demonstrate that

---

[4] *Miranda v. Arizona*, 384 U.S. 436 (1966).

[5] *See* U.S. Const. amend. V.

[6] This issue is therefore properly preserved for our review. *See* Kentucky Rule of Criminal Procedure (RCr) 9.22.

9

Joseph had "x" amount of time to fabricate his story, which was permissible. The trial court therefore overruled the objection. The Commonwealth nevertheless immediately moved on from that line of questioning.

The second alleged comment on Joseph's right to remain silent occurred during the Commonwealth's closing argument. The Commonwealth spent a great deal of time discussing the differences between Dennis' and Joseph's version of events, and asserting reasons why Dennis' version was more credible. It then said, "one of these guys told the police what happened two hours later, one of them sat in hiding for five days and waited 8 months to tell his version of events." Defense counsel objected on the same grounds as the cross-examination question.[7] The trial court again disagreed, and found that "in context it's comparing what Mr. Madorskiy said shortly thereafter to what Mr. Joseph said eight months after. It's not talking about his failure to answer questions by the police. It's temporal, and appropriate."

On appeal to this Court, Joseph renews his argument that the Commonwealth's question and statement were impermissible comments on his post-*Miranda* silence in that they suggest that Joseph refused to speak to police and give his version of events to them prior to trial. The Commonwealth asserts that it did not comment on Joseph's post-*Miranda* silence because it said nothing about Joseph refusing to speak to police. Rather, the statements were a temporal comparison of Joseph's and Dennis' version of events.

---

[7] This issue is therefore properly preserved for our review. *See* RCr 9.22.

Therefore, its purpose was not to prejudice Joseph by suggesting that he refused to speak to police, but instead to imply that he had eight months to fabricate his version of events to tell the jury. Consequently, the first question this Court must address is whether the cross-examination question and the statement during closing arguments were in fact impermissible comments on Joseph's post-*Miranda* silence. After close review of the case law in this area, we hold that they were not.

The United States Supreme Court's seminal case concerning the use of a defendant's post-*Miranda* silence at trial is *Doyle v. Ohio*.[8] In *Doyle*, federal agents used a confidential informant to buy marijuana from Jefferson Doyle (Doyle) and Richard Wood (Wood).[9] At their respective trials, the prosecution presented evidence that federal agents surveilled the undercover buy, and that after the transaction was complete, Doyle and Wood were quickly stopped, arrested, and read their *Miranda* warnings by narcotics agent Kenneth Beamer.[10] Doyle's and Woods' defenses were, in part, that the informant had framed them.[11] During cross-examination, the prosecution asked them why they did not tell Agent Beamer that they had been framed when he arrested

---

[8] 426 U.S. 610 (1976).

[9] *Id.* at 611-612.

[10] *Id.* at 611-12.

[11] *Id.* at 613.

11

them.[12]  The defense objected to the question, but was overruled, and appealed.[13]

On appeal, the Supreme Court rejected Ohio's argument that it should be able to cross-examine a defendant about his post-arrest silence for the limited purpose of impeachment.[14]  The Court expounded that

> [d]espite the importance of cross-examination, we have concluded that the Miranda decision compels rejection of the State's position. The warnings mandated by that case, as a prophylactic means of safeguarding Fifth Amendment rights, require that a person taken into custody be advised immediately that he has the right to remain silent, that anything he says may be used against him, and that he has a right to retained or appointed counsel before submitting to interrogation.  Silence in the wake of these warnings may be nothing more than the arrestee's exercise of these Miranda rights.  Thus, every post-arrest silence is insolubly ambiguous because of what the State is required to advise the person arrested. Moreover, while it is true that the Miranda warnings contain no express assurance that silence will carry no penalty, such assurance is implicit to any person who receives the warnings.  In such circumstances, it would be fundamentally unfair and a deprivation of due process to allow the arrested person's silence to be used to impeach an explanation subsequently offered at trial.[15]

The Court additionally cited Justice White's concurring opinion in *United States v. Hale*, 422 U.S. 171 (1975), with approval.[16]  In his concurrence, Justice White asserted that when an individual is arrested and informed that he has a right to remain silent, and that anything he says can be used against him,

---

[12] *Id.*

[13] *Id.* at 614.

[14] *Id.* at 616-17.

[15] *Id.* at 617-18 (internal footnotes and citations omitted).

[16] *Doyle*, 426 U.S. at 619.

it does not comport with due process to permit the prosecution during the trial to call attention to his silence at the time of arrest and to insist that because he did not speak about the facts of the case at that time, as he was told he need not do, an unfavorable inference might be drawn as to the truth of his trial testimony.[17]

Accordingly, the Supreme Court held that "the use for impeachment purposes of petitioners' silence, at the time of arrest and after receiving Miranda warnings, violated the Due Process Clause of the Fourteenth Amendment."[18]

The jurisprudence that developed in the years following *Doyle* demonstrates that "the stage of the pre-trial proceedings—such as whether the accused has been taken into custody or has been given the *Miranda* warnings—plays a significant role in whether and how an accused's silence may be used."[19]  This concept was recently addressed extensively by this Court in *Bartley v. Commonwealth.*[20]  In *Bartley*, this Court was tasked with determining, *inter alia*, "whether **pre-arrest**, **post-*Miranda*-warnings** silence may be used at trial in the prosecution's case-in-chief," notwithstanding that the *Miranda* warnings were given unnecessarily.[21]

To begin, the *Bartley* Court noted that *Doyle* "presented a **post-arrest**, **post-*Miranda*** warnings situation," and that its holding "[suggested] that

---

[17] *Id.*

[18] *Id.*

[19] *Bartley v. Commonwealth*, 445 S.W.3d 1, 6 (Ky. 2014).

[20] *Id.*

[21] *Id.* at 8 (emphasis added).

invocation of the right to silence is not necessary to protect silence, at least after having been given *Miranda* warnings."[22]  In contrast, in *Jenkins v. Anderson*, 447 U.S. 231 (1980), "the Court ruled that a defendant may be impeached by his **pre-arrest**, **pre-*Miranda*** warnings silence, noting that 'no governmental action induced petitioner to remain silent before arrest,' and that '[c]onsequently, the fundamental unfairness present in *Doyle* is not present in this case.'"[23]

Two years later, in *Fletcher v. Weir*, 455 U.S. 603 (1982), the Supreme Court addressed whether a defendant could be impeached by his **post-arrest, pre-*Miranda*** silence.[24]  The Court held that "[i]n the absence of the sort of affirmative assurances embodied in the *Miranda* warnings, we do not believe that it violates due process of law for a State to permit cross-examination as to postarrest (sic) silence when a defendant chooses to take the stand[.]"[25]

Then, in *Wainwright v. Greenfield*, 474 U.S. 284, 295 (1986), the Court held that the prosecution's use of the defendant's **post-arrest**, **post-*Miranda*** silence as evidence of his sanity was fundamentally unfair.[26]  The *Wainwright* Court expounded that "[t]he point of the *Doyle* holding is that it is fundamentally unfair to promise an arrested person that his silence will not be

---

[22] *Id.* at 6-7 (emphasis added).

[23] *Bartley*, 445 S.W.3d at 7 (emphasis added).

[24] *Bartley*, 445 S.W.3d at 7 (emphasis added).

[25] *Id.*

[26] *Bartley*, 445 S.W.3d at 7 (emphasis added).

used against him and thereafter to breach that promise by using the silence to impeach his trial testimony."[27]

Finally, the *Bartley* Court favorably cited the United States Supreme Court plurality opinion of *Salinas v. Texas,* 570 U.S. 178 (2013). *Bartley* discusses *Salinas* as follows:

> The accused took part in a **pre-custodial**, **pre-*Miranda***-warnings interview. He answered several questions but remained silent when asked whether ballistics testing would show that a shotgun owned by him was linked to a recent murder. After a few moments of silence, the police asked additional questions, and the accused continued answering them. At trial, prosecutors admitted the defendant's silence as substantive evidence of his guilt. The [*Salinas*] plurality concluded that silence alone was not enough to invoke the protections of the Fifth Amendment, and, thus, the government's use of the defendant's silence was permissible because his silence was not under the auspices of his Fifth Amendment privilege.
>
> But in reaching this decision, the [*Salinas*] plurality noted in a footnote, citing *Doyle* and *Jenkins,* that "Petitioner is correct that *due process* prohibits prosecutors from pointing to the fact that a defendant was silent after he heard *Miranda* warnings, but that rule does not apply where a suspect has not received the warnings' implicit promise that any silence will not be used against him."[28]

*Bartley* ultimately held that "the giving of *Miranda* warnings generally bars the use of any ensuing silence."[29] And, even when *Miranda* warnings are given unnecessarily, "[w]hen an accused receives the *Miranda* warnings' implicit

---

[27] *Id.*

[28] *Bartley,* 445 S.W.3d at 7-8 (emphasis added) (internal citations omitted).

[29] *Id.* at 9.

promise that any silence will not be used against her, it is fundamentally unfair and a violation of due process to then use that silence against her."[30]

The foregoing case law establishes that in order to address whether an improper comment on a defendant's right to post-*Miranda* silence occurred, appellate courts look at three dispositive factors: (1) whether the defendant had been arrested, i.e., was in custody when he remained silent; (2) whether the defendant had been read his *Miranda* warnings prior to remaining silent; and (3) whether the prosecution used the defendant's silence against him at trial. The most significant of the factors, of course, being whether the defendant had been Mirandized.

In this case, the only evidence regarding Joseph's arrest came from Detective Timothy O'Daniel. Detective O'Daniel testified that on October 18, he was notified that Joseph had turned himself in at the courthouse, that Joseph was then transferred to the homicide unit's office, and that Detective O'Daniel later transferred Joseph to corrections. There was never any discussion, from any witness, about Joseph being read his *Miranda* warnings, and Detective O'Daniel never stated that he attempted to interview Joseph either before or after his arrest. There was no evidence, for example, that Joseph had been Mirandized and then refused to tell the police his version of events, nor was his hypothetical post-*Miranda* refusal to speak to police used against Joseph by the Commonwealth. The Commonwealth simply pointed out that trial was the

---

[30] *Id.*

16

first occasion that Joseph had provided his side of the story. We therefore agree with the trial court's ruling that the Commonwealth's question was motivated by a desire to highlight that Joseph had ample time to fabricate his version of events, not to impeach him by pointing out that he did not tell the police that version of events upon his arrest.

Based on the foregoing, we hold that neither the cross-examination question, nor the prosecutor's statement during its closing argument were impermissible comments on Joseph's post-*Miranda* silence. We therefore will not review the alleged errors for constitutional harmless error, as is required for impermissible comments on Fifth Amendment silence.[31] Rather, we will review the trial court's ruling on the cross-examination question for abuse of discretion, and the Commonwealth's statement during closing argument for prosecutorial misconduct.

First, whether the trial court erred by allowing the cross-examination question depends on whether its ruling "was arbitrary, unreasonable, unfair, or unsupported by sound legal principles."[32] Based on the reasoning we have already provided, we hold that the trial court did not abuse its discretion in allowing the Commonwealth's question. Next, "prosecutorial misconduct may result from a variety of acts, including . . . improper closing argument."[33] But,

---

[31] *See id.* at 18 ("The admission of the tape was not harmless error because this Court is not convinced that the error was harmless beyond a reasonable doubt." (citing) *Chapman v. California*, 386 U.S. 18, 22, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967)).

[32] *Commonwealth v. English*, 993 S.W.2d 941, 945 (Ky. 1999).

[33] *Noakes v. Commonwealth*, 354 S.W.3d 116, 121 (Ky. 2011).

17

as we have held that the Commonwealth's argument was proper, we hold there

was no prosecutorial misconduct in the Commonwealth's argument.

**B. Issues related to the first-degree burglary conviction.**

### (1) The Commonwealth's closing argument contained a misstatement of the law, but the misstatement does not warrant reversal.

Joseph argues that the Commonwealth made a misstatement of the law

regarding first-degree burglary in its closing argument, and that the

misstatement constituted reversible prosecutorial misconduct.  For our

purposes,

> [a] person is guilty of burglary in the first degree when, with the intent to commit a crime, he knowingly enters or remains unlawfully in a building, and . . . while in the building or in the immediate flight therefrom, he . . . [c]auses physical injury to any person who is not a participant in the crime[.][34]

In its closing argument, the Commonwealth argued:

> [t]he other, I think, absurd argument here is that his intent is to break into this home to recover his personal belongings, and that makes it, 'oh, you know what? It's okay.'  I mean, think about that, logically.  You're saying as long as you break into someone else's home to recover your personal property, or just use the bathroom, it's not a burglary.  He kicked that door in, and we're left to speculate as to what his intentions were.  He wants you to give him the benefit of the doubt.

Defense counsel objected to the argument on the grounds that it was a

misstatement of the law.[35]  First, it asserted that the act of kicking in the door

could not satisfy both the "unlawful entry" and the "with intent to commit a

crime" elements of first-degree burglary.  Further, it argued that if you break

---

[34] KRS 511.020(1)(b).

[35] The issue is therefore properly preserved for our review.  *See* RCr 9.22.

into someone's home to take your own belongings, it is not first-degree burglary, it is criminal trespass. The trial court ruled that kicking in the door could satisfy both the unlawful entry and intent to commit a crime elements of burglary if his intent was to cause damage to the home. It therefore overruled the defense's objection and gave no curative admonition to the jury.

We agree with Joseph that the Commonwealth's argument was a misstatement of the law. As this Court stated in *Hedges v. Commonwealth*, "[f]or the 'intent' element of the burglary statute to have been satisfied . . . 'with the intent to commit any crime' must be understood to refer to intent to commit a crime **in addition to criminal trespass**."[36] In other words, because the burglary statutes specifically require that an individual makes an unlawful entry with the intent to commit a crime,[37] the intent to commit a crime element must be understood to be separate from the unlawful entry itself. It would be inconsistent with the plain language of the statute to allow the Commonwealth to "double dip" and assert that the intent to commit a crime element is satisfied based solely on the nature of the unlawful entry. Certainly, almost any means of unlawful entry employed by an individual could automatically suggest some kind of nefarious intent once entry is gained. Therefore, in this case, the means of the unlawful entry—kicking a door in—cannot also be used to satisfy the intent to commit a crime element of burglary. Accordingly, to the extent

---

[36] 937 S.W.2d 703, 706 (Ky. 1996) (emphasis added) (quoting Leibson, J. dissenting in *McCarthy v. Commonwealth*, 867 S.W.2d 469 (Ky. 1993) *overruled on other grounds by Lawson v. Commonwealth*, 53 S.W.3d 534 (Ky. 2001)).

[37] KRS 511.020; KRS 511.030; and KRS 511.040.

that the Commonwealth suggested that Joseph kicking the door in satisfied the first-degree burglary elements of both unlawful entry and intent to commit a crime, it misstated the law.

In that vein, the Commonwealth also misstated the law by arguing that breaking into someone else's home "to recover your personal property, or just use the bathroom" would constitute burglary. Again, burglary requires that the individual breaking in has the intent to commit a crime upon entering. Taking only your own property is not a crime. Using the bathroom is not a crime. Therefore, the specific scenario presented by the Commonwealth, would in fact, not constitute burglary, but would instead be criminal trespass. This is because, while that individual unlawfully entered a dwelling, they did not intend to commit a crime while in that dwelling. Therefore, that argument was also technically a misstatement of the law.

> Nevertheless, that does not end our inquiry.

> A claim that the prosecutor misstated the law in closing argument is a claim of prosecutorial misconduct. We follow the approach of the Court of Appeals for the Sixth Circuit when reviewing alleged prosecutorial misconduct, thus we reverse for prosecutorial misconduct in a closing argument only if the misconduct is "flagrant" or if each of the following three conditions is satisfied: (1) Proof of defendant's guilt is not overwhelming; (2) Defense counsel objected; and (3) The trial court failed to cure the error with a sufficient admonishment to the jury.[38]

We must also bear in mind that closing arguments are just that, arguments. They are not evidence, and therefore counsel on both sides are given a great

---

[38] *Matheney v. Commonwealth*, 191 S.W.3d 599, 606 (Ky. 2006).

deal of latitude while making closing arguments.[39]  Accordingly, "[a]ny

consideration on appeal of alleged prosecutorial misconduct must center on the

overall fairness of the trial.  In order to justify reversal, the misconduct of the

prosecutor must be so serious as to render the entire trial fundamentally

unfair."[40]

To address whether the prosecutor's argument was "flagrant," an

appellate court must ask the following: "(1) whether the remark[] tended to

mislead the jury or to prejudice the accused; (2) whether [it was] isolated or

extensive; (3) whether [it was] deliberately or accidentally placed before the

jury; and (4) the strength of the evidence against the accused."[41]

First, because the prosecutor's argument in this case was a

misstatement of the law, it was inherently misleading to the jury.  However, we

cannot say that Joseph was prejudiced by the misstatement.  This is because

the Commonwealth also suggested that the crime he intended to commit was to

take things from the apartment that did not belong to him, which was

appropriate.  In addition, the jury was properly instructed on the law of first-

degree burglary.  That instruction provided that the jury could only find Joseph

guilty if it found:

> (1) That in this county on or about October 13, 2018,
> he entered or remained in a dwelling located at 9614
> Westport Road without the permission of any person
> authorized to give such permission; -AND-

---

[39] *See, e.g.*, *Brewer v. Commonwealth*, 206 S.W.3d 343, 350 (Ky. 2006).

[40] *Stopher v. Commonwealth*, 57 S.W.3d 787, 805 (Ky. 2001).

[41] *Hall v. Commonwealth*, 551 S.W.3d 7, 17 (Ky. 2018).

(2) That in so doing he knew he did not have such permission; -AND-

(3) That he did so with the intention of committing a crime **therein**; -AND-

(4) That while in the dwelling or in immediate flight therefrom, he caused physical injury to Mr. Starks.[42]

Therefore, the first element of flagrancy is in favor of neither Joseph nor the Commonwealth.

Second, the misstatement was isolated: the complained-of statement was one argument during an approximately hour and a half closing argument. That element therefore weighs in the Commonwealth's favor. Third, the argument was deliberately placed before the jury in the sense that the prosecutor intentionally made the argument. But we cannot say that the prosecutor intentionally misstated the law. In other words, the prosecutor may very well have believed he was accurately stating the law. This factor must therefore be considered neutral.

Finally, the strength of the evidence against Joseph regarding first-degree burglary was strong. The identity of the perpetrator was never in question. Joseph himself stated that he knew he did not have permission to be at the apartment and that he intended to break into it. And Jerrica was adamant that he said nothing about going to get his belongings from her apartment. Additionally, the Commonwealth played a recorded phone conversation

---

[42] (Emphasis added).

between Jerrica and Joseph from two or three days after the stabbing. During the call, Jerrica asked Joseph why he went to the apartment, and he responded that he wanted to get his father's trunk. She responded that it was her brother's trunk and had her brother's belongings in it. His intention to take a trunk that was not his would have been more than enough for the jury to find that he intended to commit a crime. Finally, it was undisputed that he stabbed Antonio while in the building. This factor weighs in the Commonwealth's favor.

Consequently, on balance, we hold that the prosecutor's misconduct in misstating the law was not "flagrant." We must therefore next address whether it met the three-part test for prosecutorial misconduct. That is, (1) whether proof of Joseph's guilt was overwhelming; (2) whether counsel objected; and (3) whether the trial court failed to cure the error with a sufficient admonishment to the jury.[43] As mentioned, defense counsel objected to the Commonwealth's argument, and the trial court overruled the objection. But counsel did not request an admonition, and the court did not provide one *sua sponte*. However, for the reasons already provided, the proof of Joseph's guilt was overwhelming. We therefore hold that the three-part test for prosecutorial misconduct is not met.

---

[43] *Matheney,* 191 S.W.3d at 606.

23

Based on the foregoing, we cannot say that the prosecution's misstatement of the law was "so serious as to render the entire trial fundamentally unfair."[44]  Reversal is not required.

### (2) Joseph was not entitled to a directed verdict on the first-degree burglary charge.

Joseph's third argument to this Court is that the trial court erred by denying his motion for directed verdict on the charge of first-degree burglary. At the close of the Commonwealth's evidence, and at the close of all evidence, Joseph moved for directed verdict on first-degree burglary.  Each time he alleged that the Commonwealth failed to prove that he intended to commit a crime inside the apartment.  His argument is therefore properly preserved for our review.[45]

> On motion for directed verdict, the trial court must draw all fair and reasonable inferences from the evidence in favor of the Commonwealth.  If the evidence is sufficient to induce a reasonable juror to believe beyond a reasonable doubt that the defendant is guilty, a directed verdict should not be given.  For the purpose of ruling on the motion, the trial court must assume that the evidence for the Commonwealth is true, but reserving to the jury questions as to the credibility and weight to be given to such testimony.  On appellate review, the test of a directed verdict is, if under the evidence as a whole, it would be clearly unreasonable for a jury to find guilt, only then the defendant is entitled to a directed verdict of acquittal.[46]

As previously mentioned, the relevant elements of first-degree burglary are: (1) with intent to commit a crime; (2) a person knowingly enters or remains

---

[44] *Stopher*, 57 S.W.3d at 805.

[45] *See Ray v. Commonwealth*, 611 S.W.3d 250, 266 (Ky. 2020).

[46] *Commonwealth v. Benham*, 816 S.W.2d 186, 187 (Ky. 1991).

unlawfully in a building; and (3) when effecting entry or while in the building or in the immediate flight therefrom, he causes serious physical injury to any person who is not a participant in the crime.[47]  Joseph contends that he was entitled to a directed verdict because the Commonwealth failed to prove that he intended to commit a crime in Jerrica and Antonio's apartment.  Again, he asserts that he only went into the apartment to retrieve his belongings, and therefore he did not intend to commit a crime upon his unlawful entry into the apartment.  However, based upon the evidence, it would not have been clearly unreasonable for the jury to find him guilty.

As discussed in Section II(B)(1) of this opinion, the Commonwealth introduced evidence that Joseph told Jerrica that he went to the apartment to take a trunk that he claimed belonged to him.  But, as Jerrica claimed that the trunk belonged to her brother, ownership of the trunk became a factual question for the jury to decide.  If they believed it belonged to Jerrica's brother, it would not have been clearly unreasonable for them to find that the "intent to commit a crime" element of first-degree burglary was satisfied.  Accordingly, Joseph is not entitled to a directed verdict of acquittal.

## C. Joseph was not entitled to a directed verdict for the sentencing enhancement of being a second-degree PFO.

Joseph contends that he was also entitled to a directed verdict on the charge of being a second-degree PFO.  During the sentencing hearing defense counsel moved for directed verdict at the close of the Commonwealth's evidence

---

[47] KRS 511.020(1)(b).

and at the close of all the evidence. Counsel argued that the Commonwealth

failed to prove that Joseph was eighteen years old at the time of the prior felony

offenses.[48] The trial court denied the directed verdict motion, finding that there

was sufficient evidence of record that Joseph was eighteen during his prior

felony offenses. We agree.

During the sentencing hearing, a paralegal with the Commonwealth's

Attorney's office testified regarding Joseph's prior felony convictions. The

paralegal testified to two prior felony convictions, but the jury was instructed

on only one: 14-CR-1087, a conviction for trafficking in a controlled substance

and tampering with physical evidence. She testified that the date of that

offense was March 26, 2014, and that Joseph turned eighteen in 1999.

Therefore, it would not have been clearly unreasonable for the jury to find that

Joseph was eighteen at the time of his prior felony offense. The trial court

accordingly did not abuse its discretion by denying the defense's motion for

directed verdict.

**D. The trial court erred by limiting the defense's cross-examination of Jerrica, but the error was harmless.**

During the defense's cross-examination of Jerrica, it asked: "did Antonio

tell you he was going to fight [Joseph]?" The Commonwealth objected to the

question, and the trial court sustained the objection. The trial court ruled that

---

[48] This argument is therefore preserved for our review. *See Ray*, 611 S.W.3d at 266. Joseph also argues that the jury instructions did not require that the jury find that Joseph was eighteen at the time of his prior offenses. However, Joseph did not object to the instructions, *see* RCr 9.54(2), and did not request palpable error review of the alleged error under RCr 10.26. This Court will accordingly not address it.

the question was only relevant if Joseph was aware that Antonio told Jerrica that he was going to fight Joseph, and he was not. The defense argued that it could be admitted under KRE[49] 803(3)'s state of mind exception.[50] It submitted an exhibit by avowal of an excerpt from an interview between Jerrica and one of the investigating officers in the case from October 13. The exhibit states:

> **Q:** Okay. I mean if—but has [Chyna Bradley][51] talked to you at all about [Joseph], about anything that's going on tonight?
>
> **A:** No, I mean she just, you know, told me that, uh, [Joseph] said he was going to fight Antonio. But he told me that too, he was going to fight him.
>
> **Q:** Okay.
>
> **A:** Antonio said he was going to fight him. And I was just telling Antonio like "We don't," you know, "just leave it alone 'cause he's acting stupid, you know. I'm with you, and you who I want to be with so don't even worry about [exhibit ends].

To be clear, we are not addressing the admissibility of the double hearsay statement contained in the exhibit. Rather, we are only addressing whether the defense should have been permitted to ask Jerrica if Antonio told her that he was going to fight Joseph. A trial court's ruling on the admissibility of evidence is reviewed for abuse of discretion.[52] A trial court abuses its discretion when it rules in a way that is "arbitrary, unreasonable, unfair, or unsupported by sound legal principles."[53]

---

[49] Kentucky Rule of Evidence.

[50] This error was therefore properly preserved for our review. *See* RCr 9.22.

[51] Chyna Bradley has a child in common with Joseph.

[52] *Clark v. Commonwealth*, 223 S.W.3d 90, 95 (Ky. 2007).

[53] *English*, 993 S.W.2d at 945.

27

Joseph asserts that the evidence was admissible under KRE 803(3)'s "state of mind" exception to hearsay.  The Commonwealth contends that, under *Saylor v. Commonwealth*,[54] the statement was inadmissible because Joseph was not aware that Antonio made it.  We agree with Joseph.

In cases where a defendant claims self-defense, the victim's threats about the defendant are admissible regardless of whether the defendant was aware of them.  In *Wilson v. Commonwealth*, this Court held that

> [g]enerally, as well as in this Commonwealth, it is a well-settled rule that on a plea of self-defense evidence of threats made by the deceased against the accused, though not communicated to the accused, are competent to show the state of mind of the deceased and may be heard by the jury for the purpose of determining who was the aggressor.[55]

In *Wilson*, which involved a claim of self-defense, this Court concluded that the trial court erred by excluding testimony from two witnesses that would have testified that the victim said she was going to kill the defendant notwithstanding that the defendant was unaware of the statements.[56]

This notion was reiterated in another self-defense case, *Brock v. Commonwealth*.[57]  In *Brock*, this Court held that a recording of the victim's mother saying that the victim told her he was going to kill the defendant

---

[54] 144 S.W.3d 812 (Ky. 2004).

[55]  551 S.W.2d 569, 570 (Ky. 1977).

[56] *Id.*

[57] 947 S.W.2d 24 (Ky. 1997).

28

should be admitted on retrial, if it could be properly authenticated.[58]  This Court reiterated under *Wilson*, that "[e]ven an uncommunicated threat by the deceased against the defendant is admissible to show the deceased's state of mind prior to the killing and as evidence to prove who was the aggressor."[59]

Finally, in *Rogers v. Commonwealth*, this Court held that the exclusion of testimony that the victims had talked about killing the defendants and were planning to kill the defendants was error.[60]  Specifically, we held that "the alleged remarks about killing the [defendants] were admissible under KRE 803(3)'s exception for statements regarding then existing mental, emotional, or physical conditions (such as intent, plan, motive . . . )."[61]

The case relied upon by the Commonwealth, *Saylor v. Commonwealth*,[62] is distinguishable.  In *Saylor*, the defendant attempted to introduce police reports demonstrating that the victim had committed numerous acts of violence.[63]  However, it was undisputed that the victim's violent acts were not perpetrated on the defendant, and the defendant was unaware of the previous acts of violence until he got the police reports in discovery.[64]  This Court

---

[58] *Id*. at 31.

[59] *Id*. at 29.

[60] 60 S.W.3d 555, 557 (Ky. 2001).

[61] *Id* at 558 (citing KRE 803(3) and *Wilson, supra*) (internal quotation marks omitted).

[62] 144 S.W.3d 812 (Ky. 2004).

[63] *Id*. at 814.

[64] *Id.*

therefore ruled that the trial court properly prevented the defense from introducing the police records.[65]

The factual distinction between *Saylor* and *Wilson, Brock,* and *Rogers,* then, is that, in the latter cases, the victims made threats *about the defendants.* Whereas, in *Saylor,* the victim's prior acts of violence had nothing to do with the defendant. Therefore, in *Wilson, Brock,* and *Rogers,* the victims' threats were admissible both because they were highly relevant to the defendants' claims of self-defense, and because they qualified under the "state of mind" exception to hearsay.

Accordingly, in this case, the trial court erred by not allowing the defense to ask Jerrica if Antonio said that he was going to fight Joseph. KRE 803(3), "Hearsay exceptions, availability of declarant immaterial," directs that

> The following are not excluded by the hearsay rules, even though the declarant is available as a witness:
>
> [. . .]
>
> (3) Then existing mental, emotional, or physical condition. A statement of the declarant's then existing state of mind, emotion, sensation, or physical condition (such as intent, plan, motive, design, mental feeling, pain, and bodily health), but not including a statement of memory or belief to prove the fact remembered or believed unless it relates to the execution, revocation, identification, or terms of declarant's will.

Antonio's statement on the day of the stabbing that he was going to fight Joseph was a statement of his then existing state of mind. Further,

> [t]he crucial component of KRE 803(3) is contemporaneity of the declarant's state of mind and the statement describing it, and it

---

[65] *Id.* at 816.

30

leaves no room for the use of a statement describing a state of mind that existed at some earlier point in time. Accordingly, the statement cannot solely concern past information, but may instead cast light upon future intentions.[66]

Antonio's statement clearly casts light upon his intent to fight Joseph at some point in the future. This requirement under KRE 803(3) is therefore also satisfied.

However, while the trial court erred by not allowing the testimony, "[o]ur harmless error standard requires that if upon a consideration of the whole case this court does not believe there is a substantial possibility that the result would have been any different, the irregularity will be held nonprejudicial."[67]

According to the Commonwealth's own version of events as testified to by Dennis, Antonio was clearly the aggressor. Dennis said that after Antonio rejected Joseph's peace offering, Joseph turned toward the stairs to leave. Antonio then pushed Joseph down a set of stairs, and ran down the stairs with his fist raised at Joseph. It is therefore unlikely that testimony about Antonio's intention to fight Joseph would have affected the jury's verdict. In addition, the defense elicited the following testimony from Jerrica on cross-examination:

**Q:** Did you think that [Antonio] was going to fight Shilo Joseph?

**A**: Not that day, no.

**Q:** Not that day but other days you thought he was going to fight him?

---

[66] *Rucker v. Commonwealth*, 521 S.W.3d 562, 571 (Ky. 2017).

[67] *See, e.g., Brewer*, 206 S.W.3d at 324 (internal quotation marks omitted). *See also* RCr 9.24.

**A:** I mean, I just knew, I kind of figured they were going to eventually fight because it was so much tension. They had tension with each other. So, I eventually thought that, but I didn't think they were going to fight that day, no.

Finally, the jury was instructed on murder, but instead found that Joseph acted in self-defense, albeit imperfect self-defense. We therefore do not believe there is a substantial possibility that the result of this case would have been different if the defense had been permitted to inquire about Antonio's statement.

## E. The trial court did not improperly limit the scope of Joseph's voir dire regarding self-defense.[68]

Joseph next contends that the trial court impermissibly limited his opportunity to explore the potential jurors' biases and ability to follow the law regarding self-protection by prohibiting counsel from questioning the jurors about various aspects of the law in that area.

> [I]t is within the trial court's discretion to limit the scope of voir dire. And, appellate review of such a limitation is one for an abuse of discretion. The crucial inquiry is not whether a particular question should have been permitted, but whether denial of that question implicates fundamental fairness.[69]

---

[68] Joseph also argues that the trial court improperly limited his voir dire regarding questions about police officer testimony and burglary. Review of the record reveals that neither of those issues were properly preserved: the defense did not object to the court's ruling on either of those issues, and none of the avowal questions submitted by the defense concern either of those topics. Joseph did not request palpable error review for either issue under RCr 10.26, and this Court will therefore not review them. His arguments regarding questions about self-defense were preserved by contemporaneous objection. *See* RCr 9.22.

[69] *Ordway v. Commonwealth*, 391 S.W.3d 762, 784–85 (Ky. 2013) (internal citations and quotation marks omitted).

"Questions. . .might be helpful in assessing whether a juror is impartial. To be constitutionally compelled, however, it is not enough that such questions might be helpful. Rather, the trial court's failure to ask these questions must render the defendant's trial fundamentally unfair."[70] Counsel may not ask questions that attempt to educate the jury on the law[71] or that attempt to commit a juror in advance to a particular result.[72]

Defense counsel's attempt to question the venire about self-defense went as follows:

> **Defense:** (Addressing the venire) Do you, generally speaking, does a person have a right to defend himself or herself?
>
> **Venire:** ("Yes" responses.)
>
> **Defense:** Does anyone have a problem or an issue with that?
>
> **Venire:** (No response.)
>
> **Defense:** Let me ask you a tougher question, does a person have the right to use force to defend himself or herself?
>
> **Court:** (Addressing counsel and then the venire) I've got to stop you. This is, we had this discussion before we started, this is conceptually, I'm going to instruct you on the law of self-defense. But this is just conceptually, theoretically, the difference between being okay with self-defense and just not being okay with the idea of self-defense. I want to be clear this is not the law of self-defense.

---

[70] *Lawson v. Commonwealth*, 53 S.W.3d 534, 540 (Ky. 2001) (quoting *Mu'Min v. Virginia*, 500 U.S. 415 (1991)).

[71] *Rogers v. Commonwealth*, 315 S.W.3d 303, 307 (Ky. 2010) ("[Voir dire] is not an occasion for counsel to educate the juror panel regarding legal concepts. . . Educating the jury on legal concepts is the function of the trial court.").

[72] *Meece v. Commonwealth*, 348 S.W.3d 627, 700 (Ky. 2011) ("[The parties] were not allowed, however, to attempt to commit a juror in advance to a particular theory or result.").

**Defense:** I was asking about can you use force, generally speaking, to defend yourself.  Does anyone have a problem with that at all?

**Court:** I need you to approach.

During the side bench that followed, the trial court told defense counsel that he needed to keep his questions limited to whether the venire is okay with the concept of self-defense.  The trial court explained that counsel had been discussing self-defense as though it were a right, but there is no generalized right to self-defense.  Rather, self-defense is a privilege that someone can only use if the law says he can, and the court did not want to get into the minutia of the law of self-defense during voir dire.  The defense asked if it could inquire about under what circumstances the venire believed someone could act in self-defense.  Initially, court responded,

> you can ask about self-defense, but you can't poll the jury about what they think is legitimate self-defense and not because it doesn't matter.  They have to be okay with the idea that there is a thing called self-defense, and they'll be instructed on it, and they will apply that to the exclusion of what they think self-defense is.

After some discussion, defense counsel again requested to ask the venire "under what circumstances do you think a person can defend himself or herself."  This time, the trial court responded,

> I'll let you ask that one time and get one answer so long as you segue it immediately into "we all may have different ideas about what it is, but do you understand that the law is going to define what it is and you're stuck with what the law says, and will everybody apply what the law is over what your individualized notions are.". . . So, ask whatever you think you need to ask but please understand the court's ruling that you are limited to talking about the concept of self-defense, the generalized idea of someone under the appropriate circumstances being able to use deadly physical force and I'm okay with that.  I think that's fine because, if they're not okay with that, then they can't be on this jury.

Defense counsel then continued questioning the venire:

> **Defense:** As a legal concept, can people accept that a person may have, under the law, the ability to defend himself or herself with a weapon? Does anyone have a problem with that? Anybody at all?

> **Venire:** (No response.)

> **Defense:** And, as a concept, does anyone have a problem with a person using a weapon to defend his or her life? Does anyone say, "I couldn't do that, I couldn't consider that as a defense." Anybody at all?

> **Venire:** (No response.)

> **Defense:** Would anyone here, generally, as a concept, say, "you can't use deadly force unless you're about to die." Does anyone have that feeling?

> **Court:** You've got to leave out that last part. You can ask that question again, but ask it differently please.

> **Defense:** Would anyone as a concept automatically assume or say unless you're about to die you can't use deadly force.

> **Court:** Sorry, that's not a concept, approach the bench.

During this side bench the court explained that counsel's question was a statement of the law, and that if a juror did have a problem with it then they would not be following the law. The court again said it would not get into the law of self-defense because it is too complicated, and there was no authority for it to do so during voir dire. The court encouraged counsel to continue his questioning, but told him to stay away from polling the venire about under what circumstances it may be appropriate to use self-defense. The defense moved on to questions about burden of proof.

So, defense counsel was permitted to ask: (1) "generally speaking, does a person have a right to defend himself or herself?"; (2) "as a legal concept, can people accept that a person may have, under the law, the ability to defend himself or herself with a weapon?"; and (3) "does anyone have a problem with a person using a weapon to defend his or her life?" These questions would have been sufficient to identify jurors that could not be fair and impartial regarding Joseph's claim of self-defense wherein he used a weapon to defend himself. In addition, the trial court's limitation of counsel's questioning prevented counsel from asking questions that discussed the law of self-defense, and from polling the venire about what it believed was legitimate self-defense. This reasoning was in accordance with law and was therefore not an abuse of discretion. Accordingly, the trial court preventing counsel from asking such questions did not render the trial fundamentally unfair, and reversal is not required.

## F. The trial court did not err by amending Joseph's judgment to add a finding that he was a violent offender.

Joseph's final argument is that the trial court erred by amending his final judgment of conviction to include that he was a violent offender under KRS 439.3401 over his objection. This Court addressed and rejected a similar argument in *Benet v. Commonwealth*:

> [a]dditionally, we also reject Benet's argument that he should not be, or cannot be, classified as a violent offender under KRS 439.3401 because the trial court's final judgment did not specifically designate him as a violent offender. We agree with the Court of Appeals' recent conclusion that **a defendant automatically becomes a violent offender at the time of his or her conviction of an offense specifically enumerated in KRS 439.3401(1) regardless of whether the final judgment of conviction contains any such designation**. Thus, the trial

36

court's failure to designate Benet as a violent offender in the final judgment of conviction is, at least for purposes of this appeal, of no legal significance.[73]

KRS 439.3401(1)(c) provides that a "violent offender" is any person who has been convicted of a Class B felony involving the death of the victim. First-degree burglary is a Class B felony,[74] and to find that first-degree burglary occurred in this case, the jury was required to find that Joseph stabbed Antonio "while in the dwelling, or in immediate flight therefrom." Antonio ultimately died from that stab wound.

The trial court's amendment to the judgment was accordingly appropriate under RCr 10.10: "[c]lerical mistakes in judgments, orders or other parts of the record and errors therein arising from oversight or omission may be corrected by the court at any time on its own initiative or on the motion of any party[.]"

## III. CONCLUSION

Based on the foregoing, we affirm.

All sitting. Minton, C.J.; Conley, Hughes, Lambert, Nickell and VanMeter, JJ., concur. Keller, J., concurs in result only.

---

[73] 253 S.W.3d 528, 533 (Ky. 2008) (emphasis added).

[74] KRS 511.020(2).

COUNSEL FOR APPELLANT:

Michael L, Goodwin


COUNSEL FOR APPELLEE:

Daniel J. Cameron
Attorney General of Kentucky

Lauren Rachel Lewis
Assistant Attorney General