# IMPORTANT NOTICE
# <u>NOT TO BE PUBLISHED OPINION</u>

THIS OPINION IS DESIGNATED "NOT TO BE PUBLISHED." PURSUANT TO THE RULES OF CIVIL PROCEDURE PROMULGATED BY THE SUPREME COURT, RAP 40(D), THIS OPINION IS NOT TO BE PUBLISHED AND SHALL NOT BE CITED OR USED AS BINDING PRECEDENT IN ANY OTHER CASE IN ANY COURT OF THIS STATE; HOWEVER, UNPUBLISHED KENTUCKY APPELLATE DECISIONS, RENDERED AFTER JANUARY 1, 2003, MAY BE CITED FOR CONSIDERATION BY THE COURT IF THERE IS NO PUBLISHED OPINION THAT WOULD ADEQUATELY ADDRESS THE ISSUE BEFORE THE COURT. OPINIONS CITED FOR CONSIDERATION BY THE COURT SHALL BE SET OUT AS AN UNPUBLISHED DECISION IN THE FILED DOCUMENT AND A COPY OF THE ENTIRE DECISION SHALL BE TENDERED ALONG WITH THE DOCUMENT TO THE COURT AND ALL PARTIES TO THE ACTION.

RENDERED: MARCH 23, 2023
NOT TO BE PUBLISHED

# Supreme Court of Kentucky

2021-SC-0319-MR

TRACY L. BOYD                                                 APPELLANT

|       | ON APPEAL FROM WARREN CIRCUIT COURT |
|-------|-------------------------------------|
| V.    | HONORABLE STEVE ALAN WILSON, JUDGE  |
|       | NO. 21-CR-00064                     |

COMMONWEALTH OF KENTUCKY                      APPELLEE

## MEMORANDUM OPINION OF THE COURT

## AFFIRMING

A Warren County jury convicted Tracy L. Boyd of one count each of engaging in organized crime, trafficking in a controlled substance—heroin, trafficking in a controlled substance—methamphetamine, and being a persistent felony offender (PFO) in the first degree. Boyd received a total enhanced sentence of thirty years in prison. This appeal followed as a matter of right. *See* KY. CONST. § 110(2)(b). Having reviewed the record and the arguments of the parties, we affirm the Warren Circuit Court.

## I. BACKGROUND

On November 22, 2019, Joshua Kinkade overdosed on a lethal combination of fentanyl and methamphetamine. Soon after Kinkade died, an investigation ensued to trace the source of the drugs that led to his overdose. Police ultimately concluded that Kinkade had bought the drugs from Stephanie

Silvano. The police set up a controlled buy between Silvano and Kinkade's brother, Matthew Kinkade (Matt), who assisted in the investigation. After Matt contacted Silvano for drugs, Silvano contacted Tracy Boyd and his runner, Scott Bernauer. Matt then picked Silvano up, and they drove together to meet Bernauer at Prince Hookah Lounge in Bowling Green. Once there, and after meeting Bernauer, Silvano told Matt that she had the drugs. Police observed the interaction and attempted to follow Bernauer as he returned to his apartment. Bernauer would later testify that Silvano had given Bernauer the money from Matt in the controlled buy, and Bernauer had taken that money back to Tracy Boyd. After watching the interaction, police also followed Silvano and Matt. Police conducted a traffic stop on the pair and took Silvano into custody.

Silvano had no drugs on her person when taken into custody. After being transported to the jail, Silvano claimed that she swallowed the drugs while in the police cruiser following her arrest. However, after approximately a week in the hospital following this admission, no drugs were ever recovered. While in the hospital, Silvano denied selling Kinkade enough heroin to kill him. She did admit to also having sold from the same batch of heroin to Matt Dobring, whose body was found by his parents on November 24, two days after Kinkade's overdose. Dobring also died from overdose.

Silvano told police that she had received the drugs in this batch from her supplier, a black man who drove a white Audi and went by "C" whom she believed was actually named Tracy. Investigators later discovered that Tracy's

last name was Boyd. Silvano told the police about the apartment in which Boyd regularly made his drug deals. That apartment belonged to Boyd's uncle, Robert Cage. Police officers surveilled the apartment. At some point, two cars left the apartment complex, one of which was a white Audi. Both cars were pulled over in traffic stops. Boyd was in the Audi, and Bernauer was in the other car. Officers alleged that they stopped Boyd because they believed that his tint was illegal and because they could not clearly see his vehicle's temporary tags. Although the tint and tags were both legal, Boyd was taken into custody on a parole violation warrant. Boyd was cited for possession of marijuana and for driving without an operator's license. His phone was seized. Bernauer was not arrested at that time.

While in custody, Silvano told police that she had been buying heroin from Boyd since April or May of 2019, although she later testified that he had raised her prices after she was arrested in June of that year. The arrest in June was for trafficking heroin, methamphetamine, and cocaine, as well as possession of marijuana, receiving stolen property—firearm, promoting contraband, and trafficking heroin inside a facility. According to Silvano's testimony, following her arrest, Boyd no longer wanted Silvano around Cage's apartment. So, as Silvano testified, Boyd began using Bernauer to run drugs between himself and Silvano.

Boyd, Bernauer, and Silvano were all initially indicted as co-defendants. However, both Bernauer and Silvano received plea deals for their cooperation in Boyd's trial. A superseding indictment ultimately led to Boyd being charged

3

with engaging in organized crime, two counts of second-degree manslaughter, trafficking in a controlled substance—heroin or fentanyl, trafficking in a controlled substance—methamphetamine, trafficking in a controlled substance—cocaine, and being a PFO in the first degree.

As noted above, both Bernauer and Silvano testified at trial. Bernauer testified at trial that Boyd gave him packages to deliver to Silvano on multiple occasions. Additionally, the trial court admitted text messages between Bernauer and Brian Cage, the brother of Robert Cage. Robert's apartment was used by Boyd to conduct his drug operation. Bernauer further testified that Boyd sometimes paid him for his running services in methamphetamine. Silvano testified that Boyd would sometimes refer customers to her if he was out of heroin, although Boyd was Silvano's only heroin supplier. Neither Silvano nor Bernauer testified that they were part of a criminal organization. In addition to Silvano and Bernauer, other witnesses also testified that they either observed Boyd selling drugs or directly purchased drugs from him.

Following the jury's deliberations, Boyd was acquitted of both manslaughter charges as well as the charge of trafficking in a controlled substance—cocaine. He was found guilty of engaging in organized crime, trafficking in a controlled substance—heroin, trafficking in a controlled substance—methamphetamine, and being a PFO in the first degree. Boyd appealed his conviction to this Court. We discuss further facts as relevant in our Analysis below.

## II. ANALYSIS

Boyd alleges numerous errors by the trial court and urges this Court to reverse his conviction. First, he alleges that the trial court erred by dismissing an entire panel of the venire. Second, he argues that the trial court erred in denying his motion for a directed verdict on the charges of engaging in organized crime, trafficking in heroin, and trafficking in methamphetamine. Third, he argues that the trial court erred in denying his motion for a mistrial. Fourth, Boyd asserts that the Commonwealth failed to disclose exculpatory evidence. Fifth, he argues that the trial court erred in denying his motion to suppress the information gained from a search of his cell phone. Sixth, he argues that the trial court erred in admitting text messages that consisted of hearsay statements. Finally, he urges this Court to reverse his convictions because of cumulative error. We address each of Boyd's arguments in turn.

### A. Dismissal of Panel of Prospective Jurors

Boyd's trial was held in May of 2021 when the courts of this Commonwealth were engaged in social distancing practices to help prevent the spread of Covid-19. To achieve appropriate social distancing, the trial court split Boyd's jury venire into four panels. The panels were brought into the courtroom, one at a time, to participate in voir dire. During voir dire of the first panel, Boyd's counsel stated, "If there were to be a conviction in this case, the trial kind of keeps going on. If and only if. And I will tell you, in this case, that the outcome could put Tracy Boyd in prison for the rest of his life. It's that serious."

5

The Commonwealth immediately requested a bench conference, and the trial court advised Boyd's attorney that he could discuss range of punishment with the jury. Voir dire then continued with defense counsel asking the prospective jurors if they could consider the entire range of punishment and not just "throw the book" at Boyd.

After the voir dire of the first panel was completed, the Commonwealth argued and presented caselaw to the trial court that only the penalty range absent the persistent felony offender enhancement could be discussed with the jury.[1] The Commonwealth asked the trial court to either admonish the venire panel or to excuse the entire panel. Boyd's counsel countered that he did not mention a persistent felony offender sentence but only said that Boyd, who was fifty-three years old, could go to jail for the rest of his life. The trial court withheld any ruling at that time in order to read the caselaw provided to it by the Commonwealth.

After a break, the trial court explained to the parties that the case law he was given said that the parties could not tell the jury anything about the criminal history of the defendant and that they could not ask about PFO penalties.[2] He noted that although Boyd's counsel's statement during voir dire

---

[1] The highest offense level with which Boyd was charged was a class B felony, carrying a penalty range of ten to twenty years. With the PFO enhancement, this penalty range would increase to twenty to fifty years or life in prison.

[2] Although the audio from the trial court is difficult to understand, it seems that the trial court was referencing *Lawson v. Commonwealth*, 53 S.W.3d 534 (Ky. 2001).

to the first panel was factually correct, counsel was not allowed to make such a statement to the jury.

Voir dire then proceeded with each of the other three panels of potential jurors. When discussing the seriousness of the offenses with each of the other panels, defense counsel did not explain that Boyd could spend the rest of his life in prison if convicted. Instead, Boyd's counsel informed the potential jurors that Boyd could face up to 20 years in prison if convicted of just one of the offenses and asked if they could consider the entire range of penalties.

At the conclusion of voir dire, the trial court excused the entire first panel of the venire over Boyd's objection. In so doing, the trial court excused the only African American juror who remained after the court's other excusals and strikes for cause.

To this Court, Boyd argues that the trial court erred in dismissing the entire first panel of the venire. He argues that his trial counsel's comments to the first panel were merely referencing the seriousness of the crimes and the possibility that a conviction could result in Boyd spending the rest of his natural life in jail. Boyd further argues that the Commonwealth would have suffered only minimal prejudice if the trial court had refused to excuse the entire first panel. He, on the other hand, suffered great prejudice by its excusal because it resulted in dismissal of the only remaining African American juror and denied him a jury drawn from all qualified jurors. Finally, Boyd argues that this error was a structural error which "affect[ed] the framework within

which the trial proceed[ed]," and requires reversal. *Neder v. United States*, 527 U.S. 1, 8 (1999).

A trial court "has broad discretion in determining whether a jury panel should be dismissed." *King v. Commonwealth*, 374 S.W.3d 281, 288 (Ky. 2012) (quoting *Tabor v. Commonwealth*, 948 S.W.2d 569, 571 (Ky. App. 1997)). This Court will only reverse a trial court's ruling on this issue if it is a "clear abuse of discretion." *Id.* A trial court abuses its discretion only when its decision is "arbitrary, unreasonable, unfair, or unsupported by sound legal principals." *Commonwealth v. English*, 993 S.W.2d 941, 945 (Ky. 1999) (citations omitted).

In *Lawson v. Commonwealth*, this Court sought to definitively decide "how the possible range of penalties should be described to potential jurors during voir dire examination." 53 S.W.3d 534, 543 (Ky. 2001). In that case, the defendant faced charges of second-degree burglary (a Class C felony with a penalty range of between five and ten years), second-degree arson (a Class B felony with a penalty range of between ten and twenty years), and first-degree persistent felony offender (which would have increased the penalty ranges for each of those offenses to between ten and twenty years and twenty and fifty years or life, respectively). *Id.* at 544. During voir dire, defense counsel told the jury that "[t]he penalty range in this case is five years to life." *Id.* at 540. Upon an objection by the Commonwealth, the trial court instructed the jury to "disregard the last question by counsel who mentioned that particular range of penalties." *Id.* at 541. The defendant argued on appeal that the trial court impermissibly limited his voir dire by doing so. *Id.* at 540.

8

In *Lawson,* we sought to "strike a balance which maximizes the fundamental fairness of the proceeding by weighing the importance of selecting a fair and impartial jury against the fairness concerns implicated by" overloading the jury with information about "the possibility of convictions for lesser-included offenses, . . . the possibility of PFO-enhancement, and . . . the operation of concurrent and consecutive sentencing." *Id.* at 544, 543. To best strike this balance, we held that "voir dire should examine jurors' ability to consider only the penalty ranges for the individual indicted offenses without PFO enhancement." *Id.* at 544. We went on to explain that "where a party or the trial court wishes to voir dire the jury panel regarding its ability to consider the full range of penalties for each indicted offense, the questioner should define the penalty range in terms of the possible minimum and maximum sentences for each class of offense." *Id.* Parties should not refer to the penalty range with a PFO enhancement.

We reaffirmed this holding in *Jacobsen v. Commonwealth,* 376 S.W.3d 600 (Ky. 2012). In that case, we explained that "[t]rying to account for all of [the sentencing] possibilities . . . unduly complicated the trial court's task, risked misleading the jury about its role and about what was truly at stake in the case, and risked disclosing, implicitly, the defendant's prior criminal record." *Id.* at 608. We explained that the *Lawson* court weighed those risks "against the need to give the potential jurors some sentencing information" in order to "meaningfully assess[]" "their ability to consider the full range of

9

penalties." *Id.* Although we acknowledged that the *Lawson* rule was not perfect, we reaffirmed its application. *Id.*

The facts of the case at bar are distinguishable from those in *Lawson*. Boyd's counsel did not explicitly inform the jury of the potential penalty range as Lawson's counsel did. Instead, she merely stated that "the outcome could put Tracy Boyd in prison the rest of his life." That statement is ambiguous regarding whether defense counsel was referencing an actual sentence of life in prison (which would violate our rule in *Lawson*) or merely the practical effect of a conviction and lengthy prison sentence on a fifty-three-year-old man during a global pandemic. Because of that ambiguity, we cannot definitely say that Boyd's counsel violated our rule in *Lawson*.

We now turn to whether the trial court's excusal of the entire first panel of the venire was a clear abuse of discretion. We hold that it was not for the following reasons. First, we acknowledge that the trial court's remedy may have been extreme. The court could have used other measures to cure any potential prejudice, even though it believed that the jury likely was not prejudiced. The trial court could have admonished the jury about the correct penalty range or required defense counsel to clarify her statement to refer to Boyd's natural life, given his age and the penalty range. However, we also understand the trial court likely desired to exercise an abundance of caution in ensuring a fair jury was seated.

It is not this Court's place to second guess the trial court's use of its discretion in a case such as this one, especially because the court withheld

10

making a decision until voir dire was completed. By that time, the trial court had seen the reactions of the jurors in each of the venire panels to the questions of counsel. The court also would have seen any difference in those reactions between the members of the different panels, based on the different questions asked and statements made. The trial judge was in the best position to observe and consider any effect Boyd's counsel's statement may have had on the members of the first venire panel. *See Hayes v. Commonwealth*, 320 S.W.3d 93, 100 (Ky. 2010) ("[T]he trial court is in the best position to evaluate a juror's demeanor . . . during voir dire.") (citations omitted). Given all of this and our deferential standard of review, the trial court did not abuse its discretion in excusing the entire first venire panel.

## B. Directed Verdict

Boyd next argues that the trial court erred in denying his motion for a directed verdict on the charges of engaging in organized crime, first-degree trafficking in heroin, and first-degree trafficking in methamphetamine. Our directed verdict standard was described in *Commonwealth v. Benham:*

> On a motion for directed verdict, the trial court must draw all fair and reasonable inferences from the evidence in favor of the Commonwealth. If the evidence is sufficient to induce a reasonable juror to believe beyond a reasonable doubt that the defendant is guilty, a directed verdict should not be given. For the purposes of ruling on the motion, the trial court must assume that the evidence for the Commonwealth is true, but reserving to the jury questions as to the credibility and weight to be given to such testimony. On appellate review, the test of a directed verdict is, if under the evidence as a whole, it would be clearly unreasonable for a jury to find guilt, only then the defendant is entitled to a directed verdict of acquittal.

11

816 S.W.2d 186, 187 (Ky. 1991). "So long as the Commonwealth produces more than a mere scintilla of evidence to support the charges, a defendant's motion for directed verdict should be denied." *Taylor v. Commonwealth*, 617 S.W.3d 321, 324 (Ky. 2020). With these standards in mind, we address each of the charged crimes in turn.

*1. Engaging in Organized Crime*

Boyd argues that the trial court erred in denying his motion for a directed verdict on the charge of engaging in organized crime. Kentucky Revised Statute (KRS) 506.120 outlaws engaging in organized crime. As relevant to Boyd's case, KRS 506.120 states as follows:

> (1) A person, with the purpose to establish or maintain a criminal syndicate or to facilitate any of its activities, shall not do any of the following:
> . . . .
>> (e) Commit, or conspire or attempt to commit, or act as an accomplice in the commission of, any offense of a type in which a criminal syndicate engages on a continuing basis;
> . . . .
> (3) As used in this section "criminal syndicate" means three (3) or more persons . . . collaborating to promote or engage in any of the criminal acts provided in subsection (4)(a) to (f) of this section on a continuing basis.
>
> (4) As used in this section, "criminal gang syndicate" means three (3) or more persons acting as a part of or members of a criminal gang and collaborating to promote or engage in any of the following on a continuing basis:
> . . . .
>> (e) Illegal trafficking in controlled substances as prohibited by KRS Chapter 218A.

In this case, the Commonwealth alleged that the three members of the criminal syndicate were Boyd, Silvano, and Bernauer.

12

Boyd argues that the Commonwealth failed to present sufficient evidence that Boyd, Silvano, and Bernauer collaborated in trafficking in controlled substances on an ongoing basis. Specifically, he notes that neither Bernauer nor Silvano were charged with engaging in organized crime. He also notes that both Silvano and Bernauer denied being a part of any criminal organization during their trial testimony. They both also denied viewing Boyd as their boss or employer. Finally, he points out that Silvano testified that she sold drugs to enable her own drug addiction, not to further Boyd's business, and that she had different sources for the drugs that she sold. Boyd relies on *Parker v. Commonwealth*, 291 S.W.3d 647 (Ky. 2009), and *Edmonds v. Commonwealth*, 906 S.W.2d 343 (Ky. 1995), to support his position, arguing that the facts of his case are more like those in *Parker* than in *Edmonds*.

In *Parker v. Commonwealth,* Parker argued that the trial court erred in denying his motion for a directed verdict on the charge of criminal syndication (a prior version of the current engaging in organized crime charge). 291 S.W.3d at 675. In that case, one of the co-conspirators testified that each of the members of the gang at issue "did their own thing" when selling drugs. *Id.* at 676. Further, only three individuals were named as co-conspirators to the trafficking offense (when the statute required five), and the trafficking offense only involved a one-time drug deal, "not a continuing collaboration to sell narcotics." *Id.* We held, "It is simply beyond question that one incident involving only three individuals is not sufficient to prove the existence of an ongoing collaboration involving at least five individuals." *Id.* at 677.

13

By contrast, in *Edmonds v. Commonwealth*, Edmonds lived in a residence with the head of the "First Family," an organization consisting of at least eight people, including Edmonds. 906 S.W.2d at 347, 345. Both the manufacture and sale of crack cocaine were being conducted at that residence. *Id.* at 345, 347. Edmonds was also present in an apartment where a search warrant was executed, resulting in the seizure of cocaine, crack cocaine, marijuana, and other evidence of drug trafficking. *Id.* at 345. Edmonds also went to New York to purchase cocaine and frequently rented cars that were driven as part of the criminal syndicate. *Id.* at 347. Based on the totality of the evidence, we explained "that Edmonds either established, maintained or facilitated drug trafficking activities in which the 'First Family' engaged on a continuing basis. The members of the family numbered at least five as required by" the statute in effect at the time. *Id.*

We disagree with Boyd's contention that the facts of his case are more like *Parker* than *Edmonds*. At Boyd's trial, evidence was admitted showing that Silvano sold heroin that Boyd provided to her. Silvano testified that, although she sold other types of drugs provided to her by other people, Boyd was her sole supplier of heroin. Boyd also gave her advice on how to best operate her drug business, including that she should make her customers wait for her and always travel during rush hour. Silvano further testified that if Boyd did not have any heroin, he would direct his customers to her. There were also text messages admitted into evidence between Silvano and another man where the man referenced Boyd telling him to call Silvano to get drugs while Boyd was

14

out of town. Silvano also testified that she traveled with Boyd to Ohio to procure drugs. Finally, Silvano testified that after she was arrested for trafficking in drugs and released from jail, Boyd directed her to go through Bernauer to receive drugs from Boyd.

Bernauer, in turn, testified that he began running simple errands for Boyd, but eventually began delivering packages to Silvano. He testified that Boyd would give him a package, and Bernauer would then deliver it to Silvano. He testified that this occurred between five and ten times. Bernauer further testified that when Boyd was out of town, Bernauer would conduct transactions for Boyd, including receiving the money and providing the customer with pre-weighed drugs. Sometimes Boyd would pay Bernauer with methamphetamine. Bernauer also testified that he took the money he received from Silvano during the controlled buy with Matthew Kinkade back to Boyd. Additionally, text messages were admitted in which Boyd directed people to go to Bernauer to pick up drugs. Finally, there were numerous text messages and phone calls between Boyd, Silvano, and Bernauer, including from the day of the controlled buy, admitted into evidence.

The two elements of the engaging in organized crime statute that Boyd appears to allege were not satisfied are the collaboration element and the continuing basis element. Regarding the collaboration element, this Court has previously explained, "[C]ollaboration in the statute means simply collaborating in the scheme, and it is not necessary for the Commonwealth to show that each participant collaborating in the scheme collaborated with or even was

15

aware of the collaboration of the other participants." *Commonwealth v. Phillips*, 655 S.W.2d 6, 9 (Ky. 1983). In this case, Boyd, Silvano, and Bernauer certainly were all aware of their respective roles in the operation. Silvano relied on Boyd to supply her with heroin to sell, and Bernauer acted as a middleman between Boyd and Silvano. Further, although neither Silvano nor Bernauer admitted to being part of an organization, such recognition or intent is not relevant when assessing the practical operations of the organization. *See Commonwealth v. Jones*, 497 S.W.3d 222, 230 (Ky. 2016) ("[I]t is immaterial to our analysis whether Jones subjectively knew he was forming a criminal syndicate."). Based on the totality of the evidence admitted, the Commonwealth presented sufficient evidence of the collaboration element of the charge of engaging in organized crime.

We now turn to the continuing basis element. In order to prove the activity occurred on a continuing basis, "[t]he Commonwealth is not held to proving any specific number of incidents or any elements of time, but must show by the proof what the jury could infer from the evidence as intent to collaborate on a continuing basis." *Parker*, 291 S.W.3d at 675 (quoting *Phillips*, 655 S.W.2d at 9). In this case, the Commonwealth presented evidence of multiple instances of drug trafficking over a period of several months between Boyd, Silvano, and Bernauer. This was sufficient to establish the continuing basis element of the engaging in organized crime charge.

Accordingly, the trial court did not err in denying Boyd's motion for a directed verdict on the engaging in organized crime charge. The Commonwealth

16

presented more than a scintilla of evidence and presented sufficient evidence that a reasonable jury could find Boyd guilty of that crime.

*2. Trafficking in Heroin*

Boyd next argues that the trial court erred in denying his motion for a directed verdict on the charge of trafficking in heroin. Boyd notes that he was never found in possession of heroin and argues that the "only evidence to establish [he] was involved in any drug activity was self-serving testimony from other drug users and their text messages." He then spends the majority of his analysis attacking the credibility of the witnesses who testified against him.

Under KRS 218A.1412(1)(d), a person is guilty of trafficking in heroin "when he or she knowingly and unlawfully traffics in . . . [a]ny quantity of heroin." "Traffic," in turn, "means to manufacture, distribute, dispense, sell, transfer, or possess with intent to manufacture, distribute, dispense, or sell a controlled substance." KRS 218A.010(56).

In this case, Silvano testified that she repeatedly received heroin from Boyd and then sold it to her customers. Although he claimed that he didn't know anything about heroin, Bernauer testified that he distributed packages for Boyd. Specifically, Bernauer testified that on the day of the controlled buy, he provided the package to Silvano, which Silvano testified contained heroin. Finally, Mi.G. and Ma.G.[3] both testified that they purchased heroin from Boyd.

---

[3] We use initials to protect the privacy of the witnesses.

17

It is solely the jury's role to determine if it believes the witnesses presented. *See Eversole v. Commonwealth*, 600 S.W.3d 209, 220 (Ky. 2020) ("[A] jury is free to believe the testimony of one witness over the testimony of others." (citing *Minter v. Commonwealth*, 415 S.W.3d 614, 618 (Ky. 2013))). Given their finding of guilt on the trafficking in heroin charge, the jury must have believed at least some of the testimony presented to it from Silvano, Bernauer, Mi.G., and Ma.G., as was its prerogative.

Finally, Boyd argues that because he was not found in possession of heroin or methamphetamine, the Commonwealth did not present corroborating physical evidence, and his motion for a directed verdict should have been granted. He cites to no case that requires this level of proof, and his argument is unavailing. Our Court has held that a "[c]onviction can be premised on circumstantial evidence of such nature that, based on the whole case, it would not be clearly unreasonable for a jury to find guilt beyond a reasonable doubt." *Rogers v. Commonwealth*, 315 S.W.3d 303, 311 (Ky. 2010). The Commonwealth's case against Boyd was built on more than circumstantial evidence, as multiple witnesses directly testified that they obtained heroin from Boyd. Given this evidence, and viewing the evidence as a whole, it was not clearly unreasonable for the jury to find Boyd guilty of trafficking in heroin. Thus, the trial court did not err in denying his motion for a directed verdict.

*3. Trafficking in Methamphetamine*

Boyd next argues that the trial court erred in denying his motion for a directed verdict on the charge of trafficking in methamphetamine. He again

18

argues that because he was never found in possession of methamphetamine and because the Commonwealth relied on the testimony of witnesses who Boyd asserts were not credible, the trial court should have granted his motion for a directed verdict.

Under KRS 218A.1412(1)(e), a person is guilty of trafficking in methamphetamine "when he or she knowingly and unlawfully traffics in . . . [a]ny quantity of" methamphetamine. "Traffic," in turn, "means to manufacture, distribute, dispense, sell, transfer, or possess with intent to manufacture, distribute, dispense, or sell a controlled substance." KRS 218A.010(56).

In this case, Silvano testified that she bought a personal use amount of methamphetamine from Boyd on at least one occasion. Bernauer testified that Boyd sometimes gave him methamphetamine as payment. Bernauer also testified that he saw methamphetamine at the apartment from which Boyd sold drugs and described how the methamphetamine was packaged. He also testified that Boyd would leave methamphetamine in the apartment and that Bernauer would give it to Boyd's customers and receive the monetary payment. Finally, multiple text messages were admitted into evidence from Boyd and Bernauer referencing methamphetamine transactions.

As previously explained, the jury was at liberty to believe whichever witnesses it saw fit to believe. *See Eversole*, 600 S.W.3d at 220 (citing *Minter*, 415 S.W.3d at 618). It was also free to draw inferences from circumstantial evidence presented to it. *See Rogers*, 315 S.W.3d at 311. This Court cannot make credibility determinations on a review of a denial of a motion for directed

19

verdict. *See Benham*, 816 S.W.2d 187. Given all of the evidence presented, it was not clearly unreasonable for the jury to find Boyd guilty of trafficking in methamphetamine. Thus, the trial court did not err in denying his motion for a directed verdict.

## C. Motion for a Mistrial

Boyd next argues that the trial court erred in denying his motion for a mistrial after Silvano testified that Boyd went to a court hearing in Ohio. During Silvano's testimony, the Commonwealth asked her if she knew where Boyd obtained his drugs. She testified that one time she went with him to Ohio to get drugs but that she was not with him the entire time. She explained that for a period of time, she stayed in their hotel room while Boyd went to court. Specifically, she stated, "He was supposed to have had a court hearing, and so I stayed in the hotel room, when he went to, well when he was at court, and I worked on his laundry." Boyd immediately objected and requested a mistrial. The trial court denied his motion for a mistrial and instead gave the jury the following admonition:

> Ladies and gentlemen, there was a mention of a court date. That testimony is to be stricken and have no bearing whatsoever in any deliberation. I am directing you. Whether or not there was a court date or was not a court date is not relevant to this case at all.

This Court has

> long held that an admonition is usually sufficient to cure an erroneous admission of evidence, and there is a presumption that the jury will heed such an admonition. A trial court only declares a mistrial if a harmful event is of such magnitude that a litigant would be denied a fair and impartial trial and the prejudicial effect could be removed in no other way. Stated differently, the court must find a manifest, urgent, or real necessity for a mistrial. The

20

trial court has broad discretion in determining when such a necessity exists because the trial judge is "best situated intelligently to make such a decision." The trial court's decision to deny a motion for a mistrial should not be disturbed absent an abuse of discretion.

*Matthews v. Commonwealth,* 163 S.W.3d 11, 17 (Ky. 2005) (citations omitted).

A trial court abuses its discretion only when its decision is "arbitrary, unreasonable, unfair, or unsupported by sound legal principals." *English*, 993 S.W.2d at 945 (citations omitted).

In this case, Silvano's reference to a court date in Ohio was fleeting. No information was given to the jury about the reason Boyd had to go to court, including whether the case was civil or criminal and whether he was a witness or a party. In light of the presumption that the jury followed the trial court's admonition to disregard the evidence, the evidence was not so prejudicial that it denied Boyd a fair and impartial trial. Therefore, we cannot hold that the trial court abused its discretion in denying Boyd's motion for a mistrial.

**D. Exculpatory Evidence**

Boyd next argues that the Commonwealth committed a *Brady* violation by failing to disclose exculpatory evidence and that the trial court failed to provide him with an appropriate remedy. [4] On the second day of testimony, Detective Rick Bessette testified that he first received information about Silvano while investigating a manslaughter in Allen County, Kentucky.[5] Towards the end of trial, Detective Jason Lanham testified that he first heard Silvano's

---

[4] *Brady v. Maryland*, 373 U.S. 83 (1963).

[5] Warren County and Allen County border each other.

name from detectives who were investigating the murder of Alyssa Rodriguez in Allen County. He further testified that the detectives who were investigating that crime were tracking down leads when they spoke to several drug addicts who identified their heroin supplier as Silvano. That information was given to Detective Lanham, who began surveilling Silvano. Eventually, that surveillance led to a search warrant and, ultimately, to Silvano's arrest in June 2019.

After this testimony was elicited from Detective Lanham, Boyd's counsel requested a bench conference. Boyd's counsel explained to the trial court that he had never heard that Silvano's name first came up in a manslaughter investigation before Detective Bessette's testimony at the beginning of the trial. He argued that he had no way of knowing it was actually a murder investigation and did not know the victim's name until Detective Lanham had just testified to it. He further alleged that based on his Google search, Silvano was on surveillance video going into Rodriguez's house.[6] The Commonwealth insisted that Silvano was not a murder suspect but instead that her name came up as someone selling heroin.

The trial court then questioned Detective Lanham outside the presence of the jury and allowed Boyd to do the same. During this questioning, Detective Lanham testified that Rodriguez's murder had a marijuana nexus. He further explained that during the course of the investigation into Rodriguez's death, detectives were led to "an addict house." The people at this house told the

---

[6] Boyd argues to this Court that he could have used this information to further impeach Silvano's credibility had he known about it before she testified.

detectives that the source of their heroin supply was Silvano. This was not the house where the murder took place, and Silvano was never a suspect in the homicide.

Boyd then moved for the entirety of Silvano's testimony to be stricken from the record because the information about the death investigation was not turned over to him before the trial. The trial court overruled that motion. Boyd then moved for the trial court to prohibit Detective Lanham from testifying any further, and the trial court denied that motion as well.

The Commonwealth then continued its direct examination of Detective Lanham. Following the direct examination, Boyd cross-examined Detective Lanham. During this cross-examination, Boyd sought to connect Silvano more directly to the murder of Rodriguez but was unsuccessful. Boyd even showed a surveillance video of the murder scene and asked Detective Lanham if the woman shown in the video "match[ed] the build and description" of Silvano. Detective Lanham told the jury that, in his opinion, the woman in the video did not look like Silvano. He also testified that he never asked Silvano if it was her in the video.

Boyd argues that by failing to disclose that Silvano's name initially came to the attention of police during a murder investigation, the Commonwealth violated *Brady v. Maryland,* 373 U.S. 83 (1963). In *Brady,* the United States Supreme Court held that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence

23

is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *Id.* at 87. This Court has made clear, however, that

> "*Brady* only applies to 'the discovery, *after trial,* of information which had been known to the prosecution but *unknown to the defense.*'" *Bowling v. Commonwealth,* 80 S.W.3d 405, 410 (Ky. 2002) (emphasis in original) (quoting *United States v. Agurs,* 427 U.S. 97, 103, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976)). Consequently, when such information is disclosed at trial and the defense actively cross-examines on it, there is no *Brady* violation. *Nunley v. Commonwealth,* 393 S.W.3d 9, 13 (Ky. 2013).

*Commonwealth v. Parrish,* 471 S.W.3d 694, 698 (Ky. 2015). In this case, the information about which Boyd complains came to his attention during his trial. He was able to, and did, actively cross-examine Detective Lanham about the murder investigation and Silvano's connection to it. This Court knows of no reason, and Boyd did not cite to any reason, why Boyd could not have also recalled Silvano to the witness stand to question her about her connection to the murder investigation and its impact on her tesimony. Accordingly, the Commonwealth did not commit a *Brady* violation by failing to disclose evidence that police first learned of Stephanie Silvano when investigating the murder of Rodriguez, and the trial court did not err in denying Boyd's motions to strike the testimony of Silvano and prohibit further testimony from Detective Lanham.

**E. Cell Phone Suppression**

Boyd next argues that the information collected from his cell phone should be suppressed because it was fruit of the poisonous tree of an illegal traffic stop. To the trial court, he also argued that the stop was pretextual, that

24

the seizure of his phone was illegal, and that there was an unreasonable delay between the time police seized his phone and when they searched his phone. However, he appears to have abandoned these additional claims on appeal.

"The standard of review for a trial court's ruling on a suppression motion is two-fold. We review the trial court's factual findings for clear error, and deem conclusive the trial court's factual findings if supported by substantial evidence." *Williams v. Commonwealth*, 364 S.W.3d 65, 68 (Ky. 2011) (footnote omitted). "Substantial evidence" means "evidence that when taken alone or in light of all evidence, has sufficient probative value to induce conviction in the minds of reasonable men." *Turley v. Commonwealth*, 399 S.W.3d 412, 420 (Ky. 2013) (citations and quotations omitted).  "[W]hen the findings of fact are supported by substantial evidence, we review the court's application of the law to those facts de novo." *Bond v. Commonwealth*, 453 S.W.3d 729, 732 (Ky. 2015) (citation omitted). When doing so, "we take care 'to give due weight to inferences drawn from those facts by resident judges and local law enforcement officers.'" *Id.* (quoting *Ornelas v. United States*, 517 U.S. 690, 699 (1996)).

In this case, the trial court described the facts leading to the traffic stop of Boyd as follows:

> On November 22, 2019, the police received a call that two individuals had overdosed and was [sic] not breathing. One of those individuals, Joshua Kinkade, was pronounced dead a few hours later. During the investigation into the overdose death of Mr. Kinkade, detectives stopped and seized the phones of Stephanie Silvano, Scott Bernauer, and, ultimately, Defendant Tracy Boyd. Stephanie Silvano informed the police that she obtained Heroin from "C," who they believed to be Tracy Boyd. She advised the officers that she had purchased Heroin from C at her apartment and that C drove a white Audi. As part of their investigation, some

25

> officers watched her apartment and were looking for C. The
> detectives observed a white Audi driven by a man who fit Silvano's
> description of C. The vehicle was stopped for having, what officers
> believed to be, an illegal tint and a temporary tag that was "hard to
> read." Both the tint and tag were legal. . . . During the stop, officers
> learned that he had an E-Warrant and placed Mr. Boyd under
> arrest for a parole violation. Then, they asked for and seized his
> phone.

Boyd does not allege that any of the trial court's factual findings were erroneous. Thus, we deem them conclusive. *See Williams*, 364 S.W.3d at 68.

To this Court, Boyd argues that his arrest and the seizure of his cell phone and ultimate search of that phone were illegal because the police did not have reasonable suspicion to stop him on the night in question. The trial court disagreed. Instead, the trial court determined,

> [T]here was nothing illegal about Mr. Boyd's tint or tag, but a
> homicide investigation including the statements of Silvano
> regarding his description and his vehicle as well as the appearance
> of an illegal tint, when combined with the totality of the other
> evidence available to the detectives, created a reasonable,
> articulable suspicion to support the conduct of an investigatory
> stop.

We review the trial court's legal conclusions de novo, and we reach the same conclusion. The officers had reasonable articulable suspicion to stop Boyd.

The Fourth Amendment to the United States Constitution guarantees "the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." However, "[a] police officer may constitutionally conduct a brief, investigatory stop when the officer has a reasonable, articulable suspicion that criminal activity is afoot." *Bauder v. Commonwealth*, 299 S.W.3d 588, 590–91 (Ky. 2009) (citing *Terry v. Ohio*, 392 U.S. 1 (1968)). Reasonable suspicion requires "at least a minimal level of

objective justification for making the stop" and is more than an "unparticularized suspicion or hunch." *Id.* at 591 (citations and quotation marks omitted). We have explained,

> Accordingly, the stop of an automobile and the resulting detention of the driver are unreasonable, under the Fourth Amendment, absent a reasonable, articulable suspicion that the driver is unlicensed, or that the automobile is not registered, or that either the vehicle or an occupant is otherwise subject to seizure for violation of the law. *Delaware v. Prouse,* 440 U.S. 648, 663, 99 S.Ct. 1391, 59 L.Ed.2d 660 (1979). The court must consider the totality of the circumstances in determining whether a police officer had a particularized and objective basis for suspecting that a person stopped may be involved in criminal activity. *United States v. Cortez,* 449 U.S. 411, 417–18, 101 S.Ct. 690, 66 L.Ed.2d 621 (1981).

*Id.*

In this case, the police had information that a man named "C," who drove a white Audi and lived in a particular apartment, had sold drugs to Silvano. Silvano in turn had sold those drugs to two people who had died of a drug overdose. The police then observed a white Audi leaving the apartment complex identified by Silvano. This information was sufficient to establish a reasonable, articulable suspicion that the driver of the white Audi was involved in criminal activity.

Further, the police officer who made the stop testified that he believed the Audi's window tint was too dark and that he could not see the temporary license plate. The trial court found the officer's testimony regarding his belief that the window tint was illegal to be credible. On this basis alone, even if it was pretextual, the police officer had a legal basis to stop the car. *See Wilson v.*

27

*Commonwealth*, 37 S.W.3d 745, 749 (Ky. 2001) ("[A]n officer who has probable cause to believe a civil traffic violation has occurred may stop a vehicle regardless of his or her subjective motivation in doing so.") (citing *United States v. Akram*, 165 F.3d 452, 455 (6th Cir. 1999); *Whren v. United States*, 517 U.S. 806 (1996)). Accordingly, the trial court did not err in refusing to suppress the results of Boyd's cell phone search as fruit of the poisonous tree of an unconstitutional traffic stop.

**F. Text Messages**

Boyd next argues that the trial court erred in admitting text messages between Bernauer and Brian Cage, Boyd's uncle. He argues that the text messages contained hearsay and that his inability to cross-examine Brian Cage violated his rights under the Confrontation Clause. Boyd objected to the admission of the text messages at trial. The trial court overruled his objection, finding that the text messages were not offered for the truth of the matter asserted but instead were offered to show Bernauer's reaction and what he did with the information he received from the text messages.

The standard of review on evidentiary issues is abuse of discretion. *Clark v. Commonwealth*, 223 S.W.3d 90, 95 (Ky. 2007); *Commonwealth v. English*, 993 S.W.2d 941, 945 (Ky. 1999). "The test for abuse of discretion is whether the trial judge's decision was arbitrary, unreasonable, unfair, or unsupported by sound legal principles." *Goodyear Tire & Rubber Co. v. Thompson*, 11 S.W.3d 575, 581 (Ky. 2000) (citing *English*, 993 S.W.2d at 945).

28

The text messages at issue are as follows, with the ellipses signifying a change in date.

Brian Cage (BC): Is nephew still there my boy on his way

Scott Bernauer (SB): He is[7]

. . .

BC: Did y'all ever get good

SB: Not yet

BC: Still Nothing?

SB: Nope. What you trying to do?

BC: 3 basketball balls[8]

. . .

BC: U got any?

SB: Nope. We're still all out

BC: Did anything ever happen

SB: I'm good now.[9]

BC: Nephew there

SB: No

. . .

BC: Are you good?

---

[7] After reading this text message to the jury, Bernauer explained that "nephew" was a reference to Boyd.

[8] Bernauer then explained that "basketball" meant 8 balls, or 3.5 grams, of methamphetamine.

[9] Bernauer explained that "I'm good now" meant that he had some drugs.

SB: I am

. . .

BC: Is everything Kool?

BC: Be there in 5 minutes

SB: He said he's in [sic] his way[10]

. . .

BC: My guy on the way atleast [sic] we can play ball

BC: Kool?

SB: I don't have that much of my own gotta call nephew and see if I can get it.
It's here though.

BC: Ok.

SB: You get yours yet?

BC: I'll have your 11.00 dollars when I come that way

SB: Cool. I'm good now to[11]

. . .

BC: U up

SB: Yep.

BC: Is nephew there

SB: I don't know. He's on the war path of killing me.

BC: Why?

---

[10] Bernauer clarified that he was referring to Boyd in this text message.

[11] Bernauer explained that in this string of text messages he and Cage were talking about methamphetamine.

BC: What happened

BC: U rather not say?

SB: He insists that I picked up some money if [sic] his that he lost last night in the parking lot.[12]

BC: O wow why did it have to be you

BC: It could have been anybody

SB: Because I was the only one standing lookout at the time. So none of the crack heads that came by could have done it.

BC: I needed a ride is why I was asking but I'll call a cab I had a job to go to last night

BC: How much was it

SB: Job?? You?? Miracles do happen.

BC: Lol

BC: Yea

SB: 3 or 4 hundred he said.

Pursuant to Kentucky Rule of Evidence (KRE) 802, "[h]earsay is not admissible except as provided by these rules or by rules of the Supreme Court of Kentucky." "Hearsay" is defined as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." KRE 801(c). This Court has held that "whether a question contains an assertion, and thereby is a statement that could be

---

[12] Bernauer clarified that he was talking about the parking lot at the apartment complex where he was living.

subject to the hearsay rule, depends on the content of the question and the circumstances surrounding its utterance." *Harris v. Commonwealth*, 384 S.W.3d 117, 128 (Ky. 2012).

In this case, very little context was provided regarding the text messages between Bernauer and Brian Cage. Many of the text messages were questions. Most of those questions did not rise to the level of an assertion such that they fell within the hearsay rule. Some of the questions, however, arguably were assertions. Further, some of Brian Cage's text messages likely were not offered for their truth, but instead were offered to show Bernauer's reaction or response to the message, as found by the trial court. Without additional context, however, it is difficult to determine. Of all of Brian Cage's text messages, one was most likely to contain inadmissible hearsay: "3 basketball balls." Bernauer clarified in his testimony that "basketballs" referred to "8 balls" of methamphetamine, or 3.5 grams of methamphetamine. This is a clear reference to drug activity and the most relevant of the text messages.

We need not definitely determine whether any of these text messages were admitted in error, however. Even if they were, such an error would be harmless. This Court will deem an error in the admission of evidence harmless "if we can say with fair assurance that the judgment was not substantially swayed by the error." *Brown v. Commonwealth*, 313 S.W.3d 577, 595 (Ky. 2010). In this case, the jury heard evidence from multiple witnesses that Boyd provided drugs to Silvano, Bernauer, and others. It further heard that Silvano sold the heroin that Boyd provided to her, and that Boyd sometimes even

32

referred his own customers to Silvano. The jury also heard that Bernauer ran errands for Boyd, including delivering packages and accepting money in exchange, and that Bernauer was often paid for these errands in methamphetamine. It also heard that Bernauer acted as a middleman between Boyd and Silvano after Silvano was arrested for trafficking. Given all of this and the minimal relevance and prejudice of the text messages, "we can say with fair assurance that the judgment was not substantially swayed by" any error that may have occurred in the admission of the text messages. *Id.*

**G. Cumulative Error**

Finally, Boyd argues his conviction should be reversed due to cumulative error. Under the cumulative error doctrine, "multiple errors, although harmless individually, may be deemed reversible if their cumulative effect is to render the trial fundamentally unfair." *Brown v. Commonwealth*, 313 S.W.3d 577, 631 (Ky. 2010). "Where, as in this case, however, none of the errors individually raised any real question of prejudice, we have declined to hold that the absence of prejudice plus the absence of prejudice somehow adds up to prejudice." *Id.* (citing *Furnish v. Commonwealth,* 95 S.W.3d 34 (Ky. 2002)). In this case, the only potential error we have identified is the admission of Brian Cage's text messages. That potential error alone did not render Boyd's trial fundamentally unfair, and there are no other errors to accumulate. Accordingly, we hold there was no cumulative error in this case.

## III. CONCLUSION

For the foregoing reasons, we affirm the judgment of the Warren Circuit Court.

All sitting.  All concur.

COUNSEL FOR APPELLANT:

Kayla Danielle Deatherage
Molly Mattingly
Department of Public Advocacy

COUNSEL FOR APPELLEE:

Daniel J. Cameron
Attorney General of Kentucky

Joseph A. Beckett
Assistant Attorney General